**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FLOYD M. MAYES,
*Petitioner-Appellant*,

v.

JEFF PREMO, Superintendent, Mill
Creek Correctional Facility,
*Respondent-Appellee*.

No. 12-35461

D.C. No.
3:06-cv-06334-
HU

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Oregon
Michael W. Mosman, District Judge, Presiding

Argued and Submitted
July 9, 2013—Portland, Oregon

Filed March 27, 2014
Amended August 21, 2014

Before: Harry Pregerson, Mary H. Murguia,
and Morgan Christen, Circuit Judges.

Order;
Opinion by Judge Murguia;
Dissent by Judge Pregerson

# SUMMARY[*]

## Habeas Corpus

The panel filed an amended opinion, denied a petition for rehearing, and denied on behalf of the court a petition for rehearing en banc, in a case in which the district court denied a habeas corpus petition alleging (1) the prosecutor struck a venireman on the basis of race in violation of the Equal Protection Clause, and (2) a hearsay statement was admitted in violation of the Confrontation Clause.

The panel held that the trial court's decision to credit the prosecution's race-neutral explanation for striking a black potential juror, when viewed in light of the totality of the relevant facts, was not an objectively unreasonable application of *Batson v. Kentucky*, 476 U.S. 79 (1986).

The panel held that the trial court's decision to admit a co-defendant's hearsay statement was not an objectively unreasonable application of *Ohio v. Roberts*, 448 U.S. 56 (1980). The panel held that even if a Confrontation Clause error occurred, admission of the statement did not have a substantial and injurious effect or influence in determining the jury's verdict and the petitioner suffered no actual prejudice.

Dissenting, Judge Pregerson wrote that in concluding that the peremptory strike of the black prospective juror was race-neutral, the state trial court engaged in an unreasonable

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

determination of the facts and contravened clearly established federal law.

## COUNSEL

Nell Brown (argued), Assistant Federal Public Defender, Office of the Federal Public Defender for the District of Oregon, Portland, Oregon, for Petitioner-Appellant.

Pamela J. Walsh (argued), Assistant Attorney General; Ellen F. Rosenblum, Attorney General; Anna M. Joyce, Solicitor General, Oregon Department of Justice, Salem, Oregon, for Respondent-Appellee.

## ORDER

The Opinion filed March 27, 2014, and appearing at 747 F.3d 686 (9th Cir. 2014), is hereby amended. The amended opinion is filed concurrently with this Order.

With these amendments, Judges Murguia and Christen have voted to deny the petition for rehearing and rehearing en banc, and Judge Pregerson has voted to grant the petition for rehearing and rehearing en banc. The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

Appellee's petition for rehearing and rehearing en banc, filed May 16, 2014, is **DENIED**. No further petitions for rehearing or rehearing en banc shall be permitted.

## OPINION

MURGUIA, Circuit Judge:

Petitioner Floyd Mayes was convicted in Oregon state court of felony murder, first-degree robbery, first-degree burglary, and second-degree assault. He was sentenced to 274 months in prison. The district court denied Mayes's petition for habeas corpus, which alleged (1) the prosecutor who tried his case struck a venireman on the basis of race in violation of the Equal Protection Clause, and (2) a hearsay statement was admitted at his trial in violation of the Confrontation Clause. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

### A. The Crime

On December 11, 1994, while staying at the home of Anna Walking-Eagle, Victor Walking-Eagle and Richard Hall decided to rob James Loupe, a drug dealer who had previously sold Hall marijuana.[1] Walking-Eagle called his friend, Kevin Washington, to help with the robbery; Washington agreed and brought Frederick Knight and Petitioner Floyd Mayes to Anna's house. The group went into Walking-Eagle's room and finalized a plan: Hall would enter Loupe's home purporting to want to purchase marijuana, but once inside, Hall would let the others in to rob Loupe. They agreed to hold a gun to Hall's head to "make it look like [he] was a victim" too.

---

[1] Victor Walking-Eagle is Richard Hall's nephew and Anna Walking-Eagle's brother. We refer to Anna Walking-Eagle as "Anna" and Victor Walking-Eagle as "Walking-Eagle" throughout this opinion.

At Loupe's house, Hall knocked on the door, and Loupe's common-law wife, Erin Conaway, let him inside and walked him to the living room. Loupe and his seven-year-old twin sons were sitting on the sofa watching television. Loupe told Hall that he did not have any marijuana for sale, so Hall, pretending to be on his way, returned to the front door; when he opened the door, Walking-Eagle, Washington, Knight, and Mayes "rushed in." Knight held Hall at gunpoint by the stairway, and Mayes stood on the other side of the room. As they demanded money and marijuana, Washington pointed his pistol at Loupe, and Walking-Eagle pistol-whipped Conaway in the head. The two young boys cried, "Leave my mommy and daddy alone."

Mayes and Knight traded places by the stairway, where Mayes then held Hall at gunpoint. Conaway tried to run out the back door, but Washington ran after her, dragged her back to the living room, and pistol-whipped her in the head. Loupe, seeing his wife bleeding and screaming, got up off the couch and told Washington to leave her alone. Knight pointed his gun at Loupe, and Loupe knocked it out of Knight's hand. Loupe, Knight, and Walking-Eagle began grappling on the floor trying to gain control of the gun. Washington walked over to the melee and, as the twins cried out for their father, shot Loupe in the head. Walking-Eagle, Knight, and Mayes immediately ran out of the home, but Washington held back for a moment to take Loupe's wallet before leaving. Hall, continuing the ruse, stayed behind and called 911.

The State of Oregon indicted Hall, Walking-Eagle, Washington, Knight, and Mayes. Washington was tried and convicted on his own for aggravated murder, Hall and Walking-Eagle accepted plea bargains, and Knight and

Mayes were tried jointly.  As part of his plea bargain, Hall agreed to testify against Knight and Mayes.

## B.  Voir Dire

Fifty veniremen were examined over the course of three days on April 29, April 30, and May 1, 1996.[2]  The prosecutor[3] and counsel for the defendants questioned twenty-nine veniremen on April 29.  One of these twenty-nine, Abigail L., was black.  The prosecutor and defendants questioned the remaining twenty-one members of the venire on April 30.  Four of these twenty-one were black: Ray S., Yolanda T., Edward T., and Adelaide G.  The trial court excused three members of the venire on its own motion, and the prosecutor and defendants agreed to excuse two white jurors for cause.  The trial court granted the prosecutor's for-cause strike against Yolanda T. because she failed to disclose a prior criminal conviction.

Each party had twelve total peremptory strikes.  Twelve members of the venire occupied the jury box at one time, and the parties were allowed to strike only those veniremen in the box.  Each party was allowed to exercise two peremptory strikes per round.  If a party declined to exercise a strike in one round, that party was precluded in all later rounds from

---

[2] At the conclusion of the jury selection from among the fifty, twelve more veniremen were examined for the purpose of choosing alternate jurors.  None of these twelve potential alternates was black.

[3] There were actually two prosecutors who tried the case jointly.  We refer to them in the singular for ease of reference.

striking veniremen who were in the jury box when the party failed to exercise one of its strikes.**[4]**

One of the first twelve members of the venire who entered the jury box was Abigail L.  In Round One, Knight and Mayes each exercised their two respective—so four combined—peremptory strikes against white jurors, but the prosecutor declined to exercise his two strikes, thereby accepting Abigail L. as a member of the jury.  After another four strikes from the defendants in Round Two, the prosecutor struck two white jurors.  The defendants then made four more strikes in Round Three.  The prosecutor struck one white juror but did not use his second strike in the third round.  After the defendants made four more strikes in Round Four, Ray S. entered the jury box.  The prosecutor struck Ray S., and Knight's counsel raised a challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986).

The prosecutor explained the strike by stating that, during voir dire, Ray S. "uttered phrases that indicated identification with defendants in a criminal case," and expressed views that showed that, of all the veniremen, he "has the most problems with believing [the testimony of] a person who would be a convicted felon and a codefendant testifying under a plea agreement."  Defense counsel noted that the prosecutor's characterization of Ray S.'s testimony was "debatable." However, he offered no explanation as to why the prosecutor was incorrect in concluding that Ray S. expressed "the most" concern about the co-defendant testimony.

---

**[4]** For instance, if the party exercised its two strikes in one round, it could strike any of the other ten jurors in a later round.  However, if the party failed to exercise one or both of its strikes in a given round, it could not later strike any of the jurors who were seated in the jury box in that round.

The trial court denied Knight's *Batson* challenge, ruling,

> [Ray S.] did express considerable concern
> about the plea deal . . . . But I am holding that
> at this point the defendant has not established
> a prima facie case of peremptory challenge
> upon the basis of race, and even if it had, [Ray
> S.] did express this rather strong opinion
> about a potential witness of the State, namely
> a codefendant.

The trial court also ruled that the prosecutor's ready acceptance of Abigail L. as a member of the jury undercut the argument that the prosecutor wanted to prevent black individuals from serving on the jury. The prosecutor then exercised his second peremptory strike in Round Four against a white juror.

In Round Five, the defendants exercised their four peremptory strikes; Edward T., who is black, replaced one of the stricken veniremen, and Katherine P., who is white, replaced another. When the prosecutor exercised his first strike in Round Five to remove Edward T., the defendants again raised a *Batson* challenge.

The prosecutor explained that, in his view, Edward T. was "singularly the most dangerous" venireman: Edward T. had said he was a "rational anarchist" and knew "things are not what they seem on the surface." He was also a veteran of the Vietnam War and said his experience in combat had an "extreme[]" impact on his life and taught him "not to always believe things about people." These statements caused the prosecutor concern that Edward T. lacked respect for authority and might decline to follow the court's instructions.

The trial court agreed and denied this *Batson* challenge, ruling that "Mr. T['s] examination gives numerous grounds for peremptory challenge aside from his race." Adelaide G., who is black, then replaced Edward T. in the jury box, and the prosecutor exercised his second Round Five strike on her. The defendants raised another *Batson* challenge.

The prosecutor offered two reasons for this strike. The first was Adelaide G.'s emotional reaction during voir dire: she began weeping immediately, saying, "I just get emotional. I can't—I don't know if [the defendants] did it or not . . . . Oh, my God, I don't know." Adelaide G. said that her "emotions always run high like that" because she is a "sensitive person" and "cr[ies] over cats and dogs." The prosecutor also observed that Adelaide G. said she had never had "[a]ny connection . . . in any way" to the criminal justice system. According to the prosecutor, however, a background check revealed that she had been charged with drug possession and delivery in a gang-related case. The trial court denied the third *Batson* challenge, noting that it shared the prosecutor's concern about Adelaide G.'s emotional stability and that her emotional outburst was "rather unusual."

The defendants used their first strike in Round Six against Katherine P. After the defendants exercised their three remaining strikes in Round Six, the prosecutor had five strikes left. He declined to exercise any of them because he was satisfied with the jury, which included Abigail L.

## C.  The Trial

### 1.  The Principal Evidence

Knight and Mayes's joint trial commenced on May 2, 1996.  Knight testified at length, claiming he was just in the wrong place at the wrong time.  Knight testified that he was hanging out with Mayes when Washington called Mayes to help with the robbery and that he only agreed to go along because he was afraid of Mayes, Washington, and Walking-Eagle.  Mayes declined to testify.  His defense theory was that he had not actually been present at the scene of the crime.[5]

Hall, the state's principal witness, suffered some credibility problems.  He was high on methamphetamine the night of the crime, he hid the identity of his co-felons during the investigation's first several months, and he only admitted his own involvement approximately three months after the crime, once police found persuasive evidence implicating him.

Hall testified that he knew Walking-Eagle and Washington before the night of the crime, but that he had never previously met the men who arrived at Anna's house with Washington that night.  Consequently, he was "not positive" he had correctly identified Knight and Mayes due to his minimal familiarity with the fourth and fifth

---

[5] Conaway, the only adult eyewitness to the crime other than the participants, could never confidently identify Mayes as one of the perpetrators.  Mayes's counsel acknowledged in his closing argument that this is hardly surprising given that on the night of the crime Conaway was pistol-whipped in the head two times.

perpetrators. Aside from Hall's equivocation on this point, Knight's and Hall's respective descriptions of the crime were identical in all material respects:

- Walking-Eagle and Hall hatched the scheme at Anna's house. Washington, Knight, and Mayes arrived at Anna's house together and went to Walking-Eagle's room to discuss the robbery. They planned that Hall would pretend to want to buy marijuana, but then would open the door for the others. The men armed themselves with guns stored in Anna's house.

- Mayes and Knight rode to Loupe's house in the same car.

- Mayes had a gun upon entering Loupe's house. Once in the home, Knight stood pointing a gun at Hall by the stairway, and Mayes stood on the other side of the room. Mayes and Knight later switched places so that Mayes was the one pointing the gun at Hall by the staircase.

- At some point, Walking-Eagle went to Loupe's kitchen to look for drugs.

- Both Walking-Eagle and Washington pistol-whipped Conaway. After Washington pistol-whipped Conaway, Loupe got up off the couch to defend her and was then shot.

The eyewitness testimony was corroborated by Mayes's two confessions to two different people. Mayes told Barbara Thornton, the mother of his children, that he participated in the robbery but was not the one who killed Loupe. Mayes told Thornton that he and his co-felons had not planned on killing anybody, "but that things just happened" when Loupe

failed to comply with the robbers' demands.**⁶**    Officer
Michael Crebs, who arrested Mayes in April 1995, testified
that while he and Mayes were waiting for transportation back
to the station, Mayes said he just got "[w]rapped up" in the
incident.  Mayes asserted, "I didn't try to shoot anybody.  I
only tried to rob the motherfucker."

## 2.  Anna Walking-Eagle's Testimony

Anna testified for the State.  On direct examination, Anna
testified that she remembered one specific night "prior to
Christmas" in December 1994 when Hall, Walking-Eagle,
Washington, Knight, and Mayes were all at her house.  She
said that the men spent some time together in Walking-
Eagle's room, perhaps "smoking weed and drinking," that she
thought that they all left "within a close time of each other,"
and that Walking-Eagle and Washington returned to her home
about one hour after the five men left.  But to the prosecutor's
clear disappointment, Anna claimed she was not sure whether
this particular incident occurred on December 11, 1994, "the
night [of] the robbery and killing."

Mayes's counsel sought to undermine the implied
connection between the December 1994 night Anna discussed
on direct examination and the night of the crime.  For
instance, he elicited from Anna that it "was a pretty common
occurrence" for Walking-Eagle to have friends, including

---

**⁶** Thornton reluctantly testified at trial.  After Mayes confessed to her,
Thornton turned him in to the police.  But because she "care[d] for"
Mayes, wanted to protect their children from any more trauma, and "didn't
want to have to go to court," several times prior to trial she retracted her
statement that Mayes had confessed to her.  Ultimately, Thornton said she
decided to testify because "[t]he truth will set you free, and I'm tired of
being bound by all this."

Mayes, over to her house to drink, and that Anna had told the police that nothing about December 11, 1994, "st[ood] out in [her] mind in any way."

The prosecutor attempted to undo the damage on redirect. He elicited testimony that Anna admitted she had a "very good memory" of the December night she described on direct examination because, a few days later, Walking-Eagle talked to her "about what had happened [that night] at the Loupe residence." The defendants objected when the prosecutor asked Anna what precisely Walking-Eagle told her, but the trial court held an off-record sidebar and overruled the objection. Anna then testified that Walking-Eagle told her that, after he and the four other men left her house that night, "they went to get some weed, things got out of hand and somebody got hurt" at Loupe's.

The trial court dismissed the jury for the day and gave an on-record explanation of what happened during the sidebar. The trial court ruled that Anna's testimony about Walking-Eagle's statement was admissible because the statement was "against his own self-interest" and "therefore, passes a test of reliability."[7]

The jury convicted Knight and Mayes of felony murder, first-degree robbery, first-degree burglary, and second-degree assault. Mayes appealed, claiming (1) the prosecutor exercised his peremptory strikes on the basis of race in contravention of *Batson v. Kentucky*, and (2) admission of the

---

[7] The trial court offered to give a cautionary instruction that Walking-Eagle's statement was offered solely to refresh Anna's memory. While Mayes's counsel wanted the instruction, Knight's counsel declined the offer.

hearsay statement contained in Anna's testimony violated the Confrontation Clause. The Oregon Court of Appeals affirmed without opinion. *State v. Mayes*, 981 P.2d 401 (Or. Ct. App. 1999). The Oregon Supreme Court denied Mayes's petition for review. *State v. Mayes*, 994 P.2d 123 (Or. 1999).

Mayes raised his *Batson* and Confrontation Clause claims in his federal habeas petition, filed in December 2006. The district court denied both claims but issued a certificate of appealability ("COA") on the Confrontation Clause claim. Mayes timely appealed and briefed his *Batson* claim in addition to his Confrontation Clause claim. Our court expanded the COA to include the *Batson* issue. *See* 28 U.S.C. § 2253(c); 9th Cir. R. 22-1(e). We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253.

## STANDARD OF REVIEW

Because the Oregon courts adjudicated Mayes's claims on the merits, we may issue a writ of habeas corpus only if the adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "Clearly established" law is Supreme Court authority as it stood when a state court last adjudicated the claim on the merits. *Greene v. Fisher*, 132 S. Ct. 38, 44–45 (2011).

To mount a successful § 2254(d)(1) challenge, a prisoner must show the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011). The state court's decision must be "objectively unreasonable," not merely wrong. *Williams v. Taylor*, 529 U.S. 362, 409 (2000).

A prisoner making a § 2254(d)(2) challenge also bears a "daunting" burden. *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004). A state court's "factual determination is not unreasonable merely because [a] federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Instead, a federal habeas court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Taylor*, 366 F.3d at 1000.

The final state adjudication on the merits of Mayes's claims occurred on May 12, 1999, when the Oregon Court of Appeals affirmed Mayes's conviction on direct appeal without opinion.[8] *See Richter*, 131 S. Ct. at 784. We look through the Oregon Court of Appeals's summary affirmance to the trial court's decision. *Cannedy v. Adams*, 706 F.3d

---

[8] Neither party contends that the Oregon Supreme Court adjudicated Mayes's claims on the merits.

1148, 1159 (9th Cir. 2013). We review the district court's denial of habeas corpus relief de novo and its factual findings for clear error. *Brown v. Ornoski*, 503 F.3d 1006, 1010 (9th Cir. 2007).

## DISCUSSION

### A. *Batson* Claim

Mayes contends the prosecutor struck venireman Ray S. on the basis of race.[9] The evaluation of a prosecutor's motives for striking a juror turns, in the end, on a credibility judgment: the sole issue is whether the prosecutor's explanation "should be believed." *Jamerson v. Runnels*, 713 F.3d 1218, 1224 (9th Cir. 2013) (internal quotation marks omitted). This credibility determination is "a pure issue of fact," *Miller-El v. Cockrell* ("*Miller-El I*"), 537 U.S. 322, 339 (2003) (internal quotation marks omitted), that, even on direct review, may not be disturbed unless it was clearly erroneous, *Rice v. Collins*, 546 U.S. 333, 338 (2006). Reviewing Mayes's *Batson* claim under AEDPA, we may grant the writ only if we are convinced that a reasonable appellate court

---

[9] The *Batson* framework is well established: (1) the defendant must make a prima facie showing of racial discrimination; (2) the prosecutor must then offer a race-neutral justification for the strike; and (3) the court must then determine whether the defendant has shown the prosecutor was motivated to strike the venireman "in substantial part" based on race. *Cook v. LaMarque*, 593 F.3d 810, 814–15 (9th Cir. 2010) (internal quotation marks omitted). But where, as here, the "prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality opinion).

could *only* reasonably conclude that the Oregon trial court's credibility determination was not supported by the record. *Taylor*, 366 F.3d at 1000.

Mayes argues that various circumstances indicate that the prosecutor struck Ray S. on the basis of race. We address these circumstances in the order that they transpired during jury selection. We are not convinced they demonstrate, alone or in the aggregate, that the Oregon Court of Appeals's decision was "objectively unreasonable." *Briggs v. Grounds*, 682 F.3d 1165, 1171 (9th Cir. 2012), *cert. denied*, 133 S. Ct. 894 (2013).

### 1. Background Checks

By the conclusion of voir dire on April 30, after the court dismissed two white veniremen for cause and the parties agreed to excuse two more, seventeen veniremen from that day remained, four of whom were black. The prosecutor told the trial court that he had "some reason to believe that I want to check out more, that some of these people have not been truthful as to prior contact with the criminal justice system." The prosecutor ran background checks on three of the four black veniremen questioned during voir dire on April 30: Yolanda T., Edward T., and Adelaide G. Mayes proposes that this is evidence of racial discrimination. That proposal is not supported by the record.

First, the prosecutor's explanation for running the background checks was race-neutral: he thought some veniremen had not been truthful about prior contacts with the justice system. *Cf. Miller-El v. Dretke* ("*Miller-El II*"), 545 U.S. 231, 254–55 (2005) (finding the prosecutor's use of "jury shuffling" evidenced racial animus because "no racially

neutral reason [for the practice] has ever been offered in this case"). Second, the prosecutor stated that he ran background checks on "[e]ight or nine" veniremen and checked "both black and white and male[s] and female[s]."[10] The only on-point evidence in the record suggests the prosecutor ran background checks on up to nine of the veniremen examined on April 30; because we know three of them were run on black individuals, up to six might have been run on white veniremen.[11] We must conclude that the background checks are not strong evidence of discrimination.

### 2. Strikes for Cause on Yolanda T. and Adelaide G.

Prior to the exercise of peremptory strikes, the prosecutor moved to strike Yolanda T. and Adelaide G. for cause because they were asked if they had ever been "in court" and incorrectly said they had not.[12] The prosecutor's background checks revealed that (1) Yolanda T. had failed to disclose her 1991 criminal conviction for reckless driving, and (2) Adelaide G. had failed to disclose that she was charged

---

[10] The prosecutor did not feel the need to explain himself sua sponte. He did so only after Mayes's counsel insinuated that he ran background checks solely on black veniremen.

[11] This would mean the prosecutor conducted background checks on six of twelve white veniremen and three of five black veniremen during voir dire on April 30.

[12] The trial court instructed the jurors that "in court" meant "in as a witness, as a party in a civil case, either suing or being sued, or in a criminal case, a witness or a defendant, a petitioner."

with drug possession and delivery in 1993.[13]  Mayes contends that these for-cause strikes evidence a pattern of racial discrimination.  We disagree.

First, all of the veniremen, both white and black, were quizzed on their background with the courts or criminal justice system.  *Cf. Miller-El II*, 545 U.S. at 256–58 (disparate questioning based on race may evidence discriminatory purpose); *accord Cook v. LaMarque*, 593 F.3d 810, 825 (9th Cir. 2010).    Second, the prosecutor's explanations for striking Yolanda T. and Adelaide G. are not suspect: Yolanda T. did not disclose a criminal conviction when asked if she had ever been "in court," and Adelaide G., despite having been charged with drug possession and delivery, said she had never had any connection "in any way" to the criminal justice system.  Finally, there is no evidence the prosecutor failed to strike any similarly situated white veniremen (*i.e.*, white veniremen who were untruthful during voir dire); rather, the prosecutor and defendants agreed to strike two white veniremen who failed to give honest answers to questions posed during voir dire.

### 3.   Comparative Juror Analysis

Mayes's primary argument is that the prosecutor's reaction to Ray S.'s responses reveals racial discrimination. The prosecutor said he struck Ray S. because (1) Ray S. made statements during voir dire indicating he would identify with "defendants in a criminal case" and was overly concerned

---

[13] The trial court granted the strike as to Yolanda T. because she had actually been convicted of her crime, but denied the strike as to Adelaide G., reasoning that she might have thought she was being honest because her charges were dismissed.

with how the case would "affect . . . these guys' lives," and (2) he expressed "the most" reservation about the credibility of a co-defendant testifying pursuant to a plea agreement. The trial court credited the latter explanation and did not address the former explanation.[14]   Mayes argues that a comparison of Ray S.'s statements about co-defendant testimony to statements made by Katherine P., Robert L., and James J. demonstrates that the prosecutor's stated reason for striking Ray S. was pretextual.[15]   We reject this contention.

Though we conduct the comparative juror analysis ourselves, we are still constrained by § 2254(d)(2). *Jamerson*, 713 F.3d at 1225–26.  The question we face is whether the Oregon Court of Appeals, had it considered the comparative juror analysis in the first instance, could have reasonably affirmed the trial court's credibility determination. *See id.*

Mayes first compares the statements the prospective jurors made after the prosecutor informed them that one of the state's principal witnesses would be a co-defendant testifying pursuant to a plea agreement.  Ray S. was the most

---

[14] Whatever the prosecutor meant by that first explanation, neither the trial court nor Mayes's counsel asked for a clarification.  We will not infer from an unexplored and cryptic statement that the prosecutor was motivated in substantial part to strike Ray S. because he is black.  *See Briggs*, 682 F.3d at 1177 (declining to infer discrimination from the prosecutor's questionable reliance on "rapport" because the state trial court never addressed that proffered explanation).  And Mayes's attempt to undermine the prosecutor's first proffered explanation by claiming that "[t]he prosecutor did not strike Juror F[], even though she specifically stated that she could relate to the defendants" is meritless, because the prosecutor *did* strike Ms. F.

[15] Robert L. and James J. served on the jury; Katherine P. did not.

voluble venireman during the ensuing discussion. Katherine P. said co-defendant testimony "is not necessarily what you want" but that "[i]t could go either way." Ray S. then asserted that "[y]ou can't put a whole lot of credibility into it." Ray S. denied that he would "never" believe a co-defendant's testimony, but he said he would use his "natural skills" to evaluate the testimony: "I like this person; I don't like this person, you know. He has nothing to lose so he can sit up there and say whatever he has to say and however he wants to say it." When asked whether he could "see some benefit" to having a co-defendant testify because the co-defendant was also an eyewitness, Ray S. said "I don't know." And when asked whether he was surprised the co-defendant had two prior felony convictions, Ray S. said "Well, no, it doesn't surprise me but it don't [sic] do anything for me, either."

Even on this cold appellate record, it is clear that Ray S. expressed categorically greater skepticism about co-defendant testimony than did either Robert L. or James J. For example, Robert L. said it might be "tough" to evaluate the co-defendant's testimony, but as a juror he would "weigh it for what it is." James J. also said it would be "harder" to evaluate a co-defendant's testimony, but that such testimony "could meet the high standard of belief" and, as a juror, he would listen to the court's instructions and evaluate all the evidence accordingly. Comparing Robert L.'s and James J.'s mild answers to Ray S.'s more forceful ones does not "alter the evidentiary balance" such that the Oregon trial court's

credibility determination cannot "withstand[] our doubly deferential review."[16] *Jamerson*, 713 F.3d at 1225–26, 1228.

Like Ray S., Katherine P. spoke a good deal about the co-defendant's anticipated testimony. Upon learning that a co-defendant with prior felony convictions would testify, Katherine P. said she "hope[d]" the prosecutor could offer corroboration of the co-defendant's testimony because she "might" think someone with prior felony convictions was not "too truthful." She opined that co-defendant testimony was "not necessarily what you want" and would be "very hard to evaluate" because the co-defendant might have "ulterior motives," but she also said it "could go either way." And she seemed to acknowledge that there could be some benefit to having a co-defendant, as an eyewitness to the crime, testify, unless he was "really bad."

Comparing Ray S.'s statements to Katherine P.'s statements, we do not see cause to disturb the trial court's credibility determination, being mindful that the trial court saw and heard the prosecutor and veniremen firsthand. *See Briggs*, 682 F.3d at 1171. We read Katherine P.'s statements as being more forgiving and nuanced toward co-defendant testimony. When we consider the prosecutor's failure to strike Katherine P. in this context, we must conclude the

---

[16] As noted above, Ray S. said he could, in some circumstances, credit a co-defendant's testimony. But given the overall tenor of Ray S.'s answers, the prosecutor could have remained concerned that Ray S. would have had far greater difficulty than the other veniremen would have had crediting a co-defendant's testimony. *See Rice*, 546 U.S. at 341 ("That the prosecutor claimed to hold . . . concerns despite Juror 16's *voir dire* averments does not establish that she offered a pretext."). Moreover, Ray S.'s statement that the right circumstances for crediting the testimony would be if he "like[d]" the co-defendant is not especially reassuring.

prosecutor's credibility is safe under the "doubly deferential" standard of review we are obliged to apply. *Id.* at 1170.

In its seminal case on comparative juror analyses, the Supreme Court held that veniremen stricken by the defendant may be relevant in a comparative juror analysis. *See Miller-El II*, 545 U.S. at 245 n.4. But in that case, the defendant struck veniremen "after the prosecution decided whether to accept or reject" them. *Id.* The Court could discern the prosecutor's thoughts about those veniremen because he had actually decided that they should be "permitted to serve" on the jury. *Id.* at 241, 245 n.4; *see also Snyder v. Louisiana*, 552 U.S. 472, 483 (2008) ("The implausibility of this explanation is reinforced by the prosecutor's *acceptance* of white jurors" who expressed concerns similar to those of the stricken black venireman. (emphasis added)).

Here, the defendants ultimately struck Katherine P., and there is no indication whether the prosecutor would have permitted her to serve on the jury. After the prosecutor struck Ray S. and a white juror in Round Four, the defendants exercised their four strikes for Round Five. Both Edward T. and Katherine P. entered the jury box to replace two of the stricken veniremen. The prosecutor exercised his two Round Five strikes on black jurors Edward T. and Adelaide G. The defendants then struck Katherine P. in Round Six, when the prosecutor had five strikes left.

There is no way of knowing whether the prosecutor would have allowed Katherine P. to serve on the jury because the defendants struck her at the beginning of Round Six. Thus, all we know from this record is that the prosecutor struck Edward T. and Adelaide G. ahead of Katherine P. That the prosecutor did not strike Katherine P. before striking Edward

T. and Adelaide G. does not undermine the trial court's credibility determination. Mayes has failed to show that the strikes of Edward T. and Adelaide G. were not race-neutral or that the strikes were unsupported by the record.[17]

The purpose of a comparative juror analysis is to test the prosecutor's credibility. *Jamerson*, 713 F.3d at 1225–26. But in reviewing a *Batson* claim, we must also account for the totality of the circumstances, *id.* at 1224, and, under AEDPA, give the Oregon courts' credibility determination the benefit of the doubt, *see Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (per curiam). The background checks and for-cause strikes we have already explored do not undermine the prosecutor's credibility, so to grant the writ based on a comparison of Ray S.'s responses to Katherine P.'s responses would amount to ruling that once the prosecutor struck Ray S. because he expressed "the most" concern about co-defendant testimony, the prosecutor was obligated to strike Katherine P. before striking Edward T. or Adelaide G. lest his credibility be fatally undermined. No Supreme Court authority supports such a proposition.

### 4. Trial Court's Characterization of Ray S.'s Responses

After the peremptory strikes concluded, Mayes's counsel asked the trial court to explain to Mayes "in common sense

---

[17] As discussed previously, Edward T. described himself as a "rational anarchist" and said Vietnam had an "extreme[]" impact on his life and taught him to not trust people. Adelaide G. had a strong emotional response during her examination, which trial judge stated was unique in his experience dealing with veniremen. In addition, Adelaide G. failed to disclose that she previously had been charged with drug possession and delivery.

terms" why Ray S., Edward T., and Adelaide G. were peremptorily stricken. The trial court obliged and said Ray S. was stricken based on his view of co-defendant testimony:

> [T]hat was one of the reasons that the State said [Ray S.] practically told us that he wasn't going to believe, not that strongly, but he practically told us that if we call this guy, no chance he was going to believe him. Is that based on race, or on the fact that [Ray S.] said, "I am not going to believe it." There is a reason in that case to excuse him, other than race.

As we have noted, Ray S. told the prosecutor that he could credit a co-defendant's testimony in the right circumstances. Mayes contends, therefore, that the trial court mischaracterized Ray S.'s viewpoint, and that this mischaracterization undermines the trial court's decision to credit the prosecutor's explanation for striking Ray S. We conclude that Mayes's argument ignores the context of the trial court's statements.

Mayes's counsel asked the court to use "common sense terms" when explaining its decision to Mayes, so it was understood that the trial court's description of its decision was not intended to be taken literally. The trial court explicitly told Mayes that it was using an explanatory exaggeration: Ray S. had said similar things but "not that strongly." The prosecutor also said that he "underst[ood]" the trial court was not attempting to be precise in its "explanation to the defendant." We review the trial court's *actual* decision on Mayes's *Batson* challenge; the trial court's post-hoc explanations of the peremptory strikes are not a reliable

indication that it misapprehended the evidence in front of it. We are required to "be particularly deferential to our state-court colleagues" in our § 2254(d)(2) review. *Taylor*, 366 F.3d at 1000.

We affirm the district court's denial of Mayes's *Batson* claim. When the prosecutor said Ray S. expressed "the most" concern about the co-defendant testimony, defense counsel gave no reason to dispute that characterization. None of the surrounding circumstances establishes pretext: there is no evidentiary support for Mayes's contention that the prosecutor "engaged in a suspect practice of selectively" checking the criminal backgrounds of black veniremen, and the for-cause strikes against Yolanda T. and Adelaide G. were justified. Given our doubly deferential review, the comparative juror analysis does not sufficiently impeach the prosecutor's credibility to disturb this state-court judgment.

## B. Confrontation Clause Claim

Mayes also contends that the admission of Walking-Eagle's statement that "[we] went to get some weed" at Loupe's, but that "things got out of hand and somebody got hurt," violated the Confrontation Clause. We conclude that (1) the Oregon court's decision was not objectively unreasonable in light of then-extant Supreme Court authority, and that (2) even if it were, Mayes cannot show actual prejudice.

### 1.  Section 2254(d)

When the Oregon Court of Appeals adjudicated Mayes's claim, *Ohio v. Roberts* provided the "general approach" for answering Confrontation Clause objections. 448 U.S. 56,

65–66 (1980), *abrogated by Crawford v. Washington*, 541 U.S. 36 (2004).[18] *Roberts* held that if hearsay bore "adequate 'indicia of reliability,'" its admission did not violate the Confrontation Clause. *Idaho v. Wright*, 497 U.S. 805, 814–15 (1990) (quoting *Roberts*, 448 U.S. at 66).

We reject Mayes's contention that the Oregon trial court's failure to make an on-record finding that Walking-Eagle was unavailable to testify constituted an objectively unreasonable application of *Roberts*. *Roberts* did contain some language suggesting that unavailability is always constitutionally required for the admission of hearsay. *See, e.g.*, 448 U.S. at 65 ("In the usual case . . . the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant."). However, the Supreme Court twice rejected that "expansive" and "radical" reading of *Roberts*. *See White v. Illinois*, 502 U.S. 346, 353–55 (1992); *United States v. Inadi*, 475 U.S. 387, 392–94 (1986). Far from imposing an unavailability requirement in all cases, "*Roberts* stands for the proposition that unavailability analysis is a necessary part of the Confrontation Clause inquiry *only* when the challenged out-of-court statements were made in the course of a prior judicial proceeding."[19] *White*, 502 U.S. at 354 (emphasis added); *accord Davis v. Washington*, 547 U.S. 813, 825 & n.4 (2006) (explaining that the Supreme Court "overruled

---

[18] *Crawford* is not retroactive on collateral review. *Whorton v. Bockting*, 549 U.S. 406, 421 (2007).

[19] *White* was the final Confrontation Clause case the Supreme Court decided prior to the Oregon Court of Appeals's adjudication of Mayes's claims on May 12, 1999. *See Lilly v. Virginia*, 527 U.S. 116, 124 (1999) (in a decision issued on June 10, 1999, referring to *White* as "our most recent case interpreting the Confrontation Clause").

*Roberts* in *Crawford* by restoring the unavailability . . . requirement[]" for testimonial statements made in other settings); *see also Barber v. Page*, 390 U.S. 719, 725–26 (1968) (admission of testimony given at a preliminary hearing violated the Confrontation Clause because the state failed to demonstrate the declarant was unavailable).

Mayes's reliance on *Lee v. Illinois*, which held that the confession of the defendant's accomplice contained inadequate indicia of reliability for admission under *Roberts*, is unavailing. In *Lee*, the Court expressly did "not address the question of . . . availability." 476 U.S. 530, 539 (1986). Even if Mayes is correct that in *Lee* the Court "assumed that the *Roberts* unavailability requirement applied to a co-defendant confession," that is no help. Assuming an issue without deciding it is a textbook example of dictum, and "clearly established law" under AEDPA refers "to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. When the Oregon courts adjudicated Mayes's claim, the Supreme Court had never clearly held that the trial court had to declare on the record that a witness is unavailable in order to admit his hearsay statement through another witness, so we may not impugn the Oregon courts' judgment on that basis. *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) ("[T]his Court has held on numerous occasions that it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." (internal quotation marks omitted)); *Carey v. Musladin*, 549 U.S. 70, 77 (2006) ("Given the lack of holdings from this Court . . . it cannot be said that the state court unreasonably applied clearly established

Federal law." (internal quotation marks and alterations omitted)).

We conclude that Walking-Eagle's statement bore adequate indicia of reliability such that admitting it was not "an error well understood and comprehended [under the *Roberts* framework] beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786–87. Walking-Eagle made the self-inculpatory statement spontaneously to his sister in private mere days after the crime; in that setting, Walking-Eagle had little incentive to "shift . . . blame, curry favor, avenge himself, or divert attention to another." *Lee*, 476 U.S. at 545. When the Oregon courts adjudicated Mayes's claim, there was substantial circuit authority holding that self-inculpatory statements that also inculpate the accused are reliable when made in private to family members or friends. *See Lilly v. Virginia*, 527 U.S. 116, 147 n.3 (1999) (Rehnquist, C.J., concurring in the judgment) (compiling cases). We too interpreted *Roberts* as permitting the admission of self-inculpatory statements incriminating the accused when made "in private, to a friend, without mitigating [the accomplice's] own role in the crime." *Padilla v. Terhune*, 309 F.3d 614, 618–19 (9th Cir. 2002) (citing *United States v. Boone*, 229 F.3d 1231, 1234 (9th Cir. 2000)). Thus, we must also conclude that the Oregon courts' decision to admit Walking-Eagle's statement—a statement made in private, to his sister, without mitigating his own role in the crime—constituted a reasonable application of the *Roberts* framework.

## 2. Prejudice

Alternatively, even if Mayes could pass § 2254(d)(1)'s relitigation bar, we would still affirm the district court's

decision because the admission of Walking-Eagle's statement did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (internal quotation marks omitted). In other words, even if a Confrontation Clause error occurred, Mayes suffered no "actual prejudice." *Id.* at 637 (internal quotation marks omitted).

In Oregon, a conviction cannot be based solely upon the testimony of an accomplice. Or. Rev. Stat. § 136.440 (formerly codified at Or. Rev. Stat. § 136.550). For accomplice testimony to be considered, the jury must first conclude that non-accomplice evidence "tends to connect" the defendant to the commission of the offense. *Id.*; *State v. Bunyard*, 144 P. 449, 450 (Or. 1914) (holding that the jury must decide whether evidence corroborates accomplice testimony). Hall and Knight were both accomplices, but their testimony was corroborated independent of Walking-Eagle's statement: Thornton and Officer Crebs each testified that Mayes confessed that he tried to rob, but did not shoot, Loupe. We consider Hall's and Knight's testimony in our prejudice analysis.

Several factors guide the prejudice inquiry in the Confrontation Clause context: "the importance of the [wrongly admitted] testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony, the extent of cross-examination permitted, and the overall strength of the prosecution's case." *Ocampo v. Vail*, 649 F.3d 1098, 1114 (9th Cir. 2011) (internal quotation marks omitted). No one factor is dispositive. *Cf. Slovik v. Yates*, 556 F.3d 747, 755–56 (9th Cir. 2009).

**Whether the Statement Was Important**: Walking-Eagle's statement, elicited during the redirect examination of Anna, was not important in this week-long trial with a number of witnesses. In his closing argument, the prosecutor mentioned Anna's testimony that Mayes was at her house prior to commission of the crime, but this was not necessarily a reference to Walking-Eagle's hearsay statement; Anna fairly implied Mayes's involvement during her direct examination. *See United States v. Bracy*, 67 F.3d 1421, 1431 (9th Cir. 1995) (a prosecutor's closing arguments may draw "reasonable inference[s] from the evidence presented"). The prosecutor did mention Walking-Eagle's statement explicitly in his rebuttal argument, but only after Mayes's counsel mentioned it in his closing argument. It seems highly improbable that the prosecutor's brief mention, on rebuttal, of Walking-Eagle's statement had any meaningful impact on the jury in light of all of the evidence at trial. *See Brecht*, 507 U.S. at 639 (no actual prejudice where the state's references to improper evidence were "infrequent").

**Whether the Statement Was Cumulative or Corroborated**: Hall and Knight testified in detail about Mayes's involvement in the crime, and although their credibility was "inevitably suspect," *Bruton v. United States*, 391 U.S. 123, 136 (1968), their testimony was identical in all material respects. Thornton and Officer Crebs also testified that Mayes confessed to participating in the robbery and being present when Loupe was shot. In light of this evidence, Anna's testimony that Walking-Eagle said "[we] went to get some weed, things got out of hand and somebody got hurt" added nothing new. *Cf. Ortiz v. Yates*, 704 F.3d 1026, 1039 (9th Cir. 2012) (limitation on cross-examination caused actual prejudice because the prosecution's case "turned *almost entirely* on what [the witness] said on the witness

stand about the night of the alleged incident, and whether the jury found that story credible" (emphasis added)). Moreover, Thornton's and Officer Crebs's testimony was consistent with Hall's and Knight's: Mayes participated in the robbery, but he did not shoot Loupe. *Cf. Ocampo*, 649 F.3d at 1116 (third-party testimony conflicted with eyewitness testimony on "crucial" matter).

While corroborative evidence may, as a general rule, make the wrongful introduction of other evidence harmless, this concept has no application where "(1) there was a reason for the jury to doubt the only eyewitness testimony; (2) the third party testimony was not exceptionally strong; and (3) the physical evidence connecting the accused to the crime was limited." *Whelchel v. Washington*, 232 F.3d 1197, 1208 (9th Cir. 2000). This standard is not met here. Hall was not the "only" eyewitness: Knight also testified that Mayes participated in the robbery. In addition, the third-party testimony from Officer Crebs was compelling. The testimony from Thornton was also quite strong, even though she had previously retracted some of her statements; she explained in her testimony that she hated incriminating the father of her children.

**Extent of Cross-Examination**: Because he did not testify at trial, Walking-Eagle was not subject to cross-examination.[20] As for Mayes's contention that he should

---

[20] Defense counsel, however, vigorously cross-examined Anna, eliciting, for instance, the damaging statement that she was nearly always drunk on "[t]hree or four 40 ouncers" when Walking-Eagle had friends over to her house. *Cf. United States v. Seeley*, 892 F.2d 1, 3 (1st Cir. 1989) (noting the utility of the defendant's ability to cross-examine the in-court witness who relates an out-of-court declarant's hearsay statement).

have been able to impeach Walking-Eagle's character, the jurors were well aware that there was reason to be cautious of Walking-Eagle's testimony; they heard testimony explaining that he masterminded the robbery and that he was a gang member.

Considering the trial record as a whole—including the challenges to the prosecution's case—we cannot say that we are left with "grave doubt" that the admission of Walking-Eagle's statement had a "substantial and injurious effect or influence" on the verdict. *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (quoting *Brecht*, 507 U.S. at 627).

## CONCLUSION

The Oregon trial court's decision to credit the prosecutor's race-neutral explanation for striking Ray S., when viewed in light of the totality of the relevant facts, was not an objectively unreasonable application of *Batson v. Kentucky*. Nor was the Oregon trial court's decision to admit Walking-Eagle's hearsay statement an objectively unreasonable application of the *Roberts* framework.

**AFFIRMED.**

PREGERSON, Circuit Judge, dissenting:

The prosecution in this case struck four out of five black prospective jurors during voir dire. Three of those four black prospective jurors were struck using peremptory challenges. Perhaps this was simply an incredible coincidence. But it is

hard to avoid concluding "that the State was trying to avoid black jurors." *Miller-El v. Dretke*, 545 U.S. 231, 255 (2005).

"Because just one racial strike calls for a retrial," *Kesser v. Cambra*, 465 F.3d 351, 369 (9th Cir. 2006) (en banc), we need not determine whether the prosecution acted with discriminatory intent every time it used a peremptory challenge to strike yet another black prospective juror. If even just one of the prosecution's peremptory challenges was not race-neutral, Mayes is entitled to habeas relief.

At least one of the prosecution's peremptory strikes was not race-neutral. The record cannot support any race-neutral reason for the prosecution's peremptory strike against Ray S., a black prospective juror. In concluding that the peremptory strike against Ray S. was race-neutral, the state trial court engaged in an unreasonable determination of the facts and contravened clearly established federal law.

I would grant Mayes's habeas petition on his *Batson* claim. Therefore, I respectfully dissent.

## I. The peremptory strike against Ray S. was not race-neutral.

When asked to provide a race-neutral reason for striking Ray S., the prosecution explained that Ray S. had "the most problems with believing the type of witness the State [was] going to be calling in trial, a person who would be a convicted felon and a codefendant testifying under a plea agreement." There is a big problem with the prosecutor's explanation: it ain't true.

During voir dire, the prosecution asked prospective jurors how they felt about "the idea of a witness who is testifying in a criminal case, who actually was one of the codefendants, who is testifying under an agreement." Elaborating, the prosecution explained, "In this instance, the person who is testifying has been convicted."

It is natural to be skeptical of a convicted criminal who is only coming forward to testify against his accomplices to enjoy the benefits of a favorable plea bargain. Several prospective jurors in this case shared this natural skepticism. After asking prospective jurors to consider a scenario in which a convicted co-defendant was testifying under a plea agreement, the prosecution asked, "Anybody like that concept?" The prospective jurors apparently made it clear that they did not like that concept, because the prosecution immediately added, "I didn't think so. *Nobody* likes it."

Several white prospective jurors personally expressed this skepticism. Katherine P. feared that a co-defendant testifying pursuant to a plea agreement "would do it from ulterior motives." She also expressed other reasons for distrusting such a witness: "someone who has committed several felonies, I might think that they weren't too truthful, also." Paul S., likewise, expressed skepticism about such testimony: "I think I am less comfortable about it." The prospective juror who became Juror No. 8 also voiced concern: "When you start talking about having one person rat on another one to get a conviction, and so forth, that's a tough issue . . . ." The prospective juror who became Juror No. 12 agreed: "I think that the judgment of truthfulness of such a witness is going to be a lot harder than an ordinary witness . . . ."

Though they expressed considerable skepticism towards a plea-bargaining co-defendant, these prospective jurors affirmed that they would ultimately evaluate such a witness fairly and impartially.  Juror No. 12 resolved his misgivings about such co-defendant testimony by affirming that, though he would hold such testimony to a higher standard than the testimony of an "ordinary witness," "[i]t could meet the high standard of belief."  Juror No. 8, likewise, acknowledged that he would ultimately feel compelled to "weigh it for what it is."

Ray S. — the black prospective juror struck by the prosecution — echoed his colleagues' attitudes towards testimony from a plea-bargaining co-defendant.  Asked how he felt about such testimony, Ray S. joined his colleagues in initially expressing skepticism:  "You can't put a whole lot of credibility into it."  But like his colleagues, Ray S. also understood that he would need to evaluate such testimony fairly and impartially.  When the prosecution asked Ray S., "are you telling me that, just because this guy was dealing, you are never going to believe anything he says?",  Ray S. replied, "No, not at all."  While Ray S. was aware of the risk that such a witness "has nothing to lose so he can sit up there and say whatever he has to say and however he wants to say it," Ray S. emphasized that he did not assume that all such witnesses would do this:  "I am just saying it is possible." Like his colleagues, Ray S. affirmed that he would ultimately evaluate the witness's credibility in the same way he would evaluate the credibility of any other witness, using "[w]hat I use in everyday life, just my natural skills I have in judging people."

Immediately after examining Ray S. during voir dire, the prosecution acknowledged that Ray S.'s position matched the

position taken by Ray S.'s colleagues: "I guess, if I went across the board, you are probably pretty much all saying the same thing."

Only later — after Mayes's *Batson* objection compelled the prosecution to offer some race-neutral reason for striking Ray S. — did the prosecution allege that Ray S. had "the most problems with believing the type of witness the State [was] going to be calling in this trial, a person who would be a convicted felon and a codefendant testifying under a plea agreement." As the record shows, this proffered race-neutral reason simply was not true.

Like other prospective jurors, Ray S. expressed skepticism towards a co-defendant testifying to fulfill a plea bargain. Like other prospective jurors, Ray S. tempered this skepticism by affirming that he would ultimately evaluate the credibility of such a witness fairly and impartially. Unlike most other prospective jurors, Ray S. was black. And unlike other prospective jurors who were white — but like most other prospective jurors who were black — Ray S. was removed from the venire by the prosecutor's exercise of a peremptory strike. This is not what a race-neutral peremptory strike looks like.

## II.  Mayes is entitled to habeas relief.

In ruling that the peremptory strike against Ray S. was race-neutral, the state trial court contravened clearly established federal law, and engaged in an unreasonable determination of the facts. Thus, I would grant Mayes's habeas petition.

### A. The state trial court contravened clearly established federal law.

First, the state trial court contravened clearly established federal law, *see* 28 U.S.C. § 2254(d)(1), by mischaracterizing Ray S.'s testimony to bolster the prosecution's purported race-neutral reason for striking Ray S.

The state trial court, in explaining why it ruled that the prosecutor's strike against Ray S. was race-neutral, could not justify its ruling without seriously mischaracterizing Ray S.'s testimony. According to the trial court, "[Ray S.] practically told us that if we call [a co-defendant testifying pursuant to a plea agreement], *no chance* [Ray S.] was going to believe [the co-defendant]." But Ray S. said no such thing. Nevertheless, the trial court reiterated that "[Ray S.] said, 'I am not going to believe it.'" In fact, Ray S. said the exact opposite.

It is clearly established law that a prosecutor may not mischaracterize a prospective juror's voir dire statements to justify the prosecution's exercise of a peremptory strike. *Miller-El*, 545 U.S. at 244. In my view, the trial court's *Batson* ruling was contrary to the clearly established law of *Miller-El.* A state court decision is contrary to clearly established federal law when it "confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005). The trial court's mischaracterization of Ray S.'s testimony is materially indistinguishable from a *prosecutor* mischaracterizing juror testimony: judges, no less than prosecutors, are ministers of justice, who are obliged to see that justice is done and truth prevails.

**B. The state trial court based its ruling on an unreasonable determination of the facts.**

As any reasonable comparative juror analysis reveals, the prosecution's peremptory strike against Ray S. was not race-neutral. Thus, the state trial court's conclusion that the prosecution's strike against Ray S. *was* race-neutral was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2).

To ascertain whether the state trial court reasonably determined that the peremptory strike against Ray S. was race-neutral, we must compare Ray S. to other prospective jurors who were not peremptorily struck by the prosecution. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller-El*, 545 U.S. at 241. Where, as here, "the state court has not performed this comparative juror analysis, we must do so in the first instance." *Jamerson v. Runnels*, 713 F.3d 1218, 1226 (9th Cir. 2013). Under this comparative juror analysis, we compare prospective jurors who were struck by the prosecution to all prospective jurors who were *not* struck by the prosecution, whether or not those prospective jurors ultimately served on the jury. *See Miller-El*, 545 U.S. at 244–45.

In this case, other prospective jurors were like Ray S. in every relevant way except for their race — and they were not peremptorily struck by the prosecution. Thus, it was unreasonable for the state trial court to conclude that the prosecution's peremptory strike against Ray S. was race-neutral.

To be sure, Ray S. voiced skepticism about a co-defendant testifying pursuant to a plea agreement. In this respect, Ray S. was no different from four of his fellow prospective jurors: Katherine P., Paul S., Juror No. 8, and Juror No. 12. All four of these other prospective jurors were white. "If, indeed, [Ray S.'s] thoughts on [a co-defendant testifying pursuant to a plea agreement] did make the prosecutor uneasy, he should have worried about a number of white panel members he accepted with no evident reservations." *Miller-El*, 545 U.S. at 244. But the prosecution did not worry about those other prospective jurors — who shared Ray S.'s concerns, but did not share his race.

Ray S. differed from his four colleagues in just one relevant respect: Ray S. was black. And so the prosecution struck Ray S.; it did not strike his four white colleagues. In this light, it was unreasonable for the state trial court to conclude that the prosecution's peremptory strike against Ray S was race-neutral.

### Conclusion

I would hold that the state trial court's denial of Mayes's *Batson* claim was contrary to clearly established federal law and rested on an unreasonable determination of the facts, and I would grant the habeas petition. Therefore, I respectfully dissent.