**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHARLES STEVENS,
              *Petitioner-Appellant*,

v.

RONALD DAVIS, Warden, San
Quentin State Prison,
              *Respondent-Appellee.*

No. 19-99004

D.C. No.
3:09-cv-00137-
WHA

OPINION

Appeal from the United States District Court
for the Northern District of California
William Alsup, District Judge, Presiding

Argued and Submitted July 19, 2021
Pasadena, California

Filed February 14, 2022

Before: Sandra S. Ikuta, Paul J. Watford, and
Daniel P. Collins, Circuit Judges.

Opinion by Judge Ikuta

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel affirmed the district court's judgment denying federal habeas relief to Charles Stevens, who was convicted by a California jury of four murders and six attempted murders, and sentenced to death.

Stevens claimed that the prosecutor's decision to strike black prospective jurors constituted purposeful discrimination on the basis of race, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).

Stevens claimed that the California Supreme Court made an unreasonable determination of the facts in upholding the trial court's conclusion that the prosecutor did not purposefully discriminate in striking Larry Foster, Jean Clemons, and Henry Hill. The panel considered these claims on a strike-by-strike basis, in light of all of the relevant facts and circumstances, under the doubly deferential standard of 28 U.S.C. § 2254(d)(2).

Stevens argued that the prosecutor's nondiscriminatory reasons for challenging Foster were not supported by the record, because the prosecutor mischaracterized Foster's responses, and because the prosecutor's nondiscriminatory reason for striking Foster applied just as well to other members of the venire accepted by the prosecutor. The panel concluded that Stevens failed to show

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

that the California Supreme Court reached an objectively unreasonable factual determination on this claim. The panel did not need to resolve whether this court must consider additional prospective jurors raised for the first time on collateral review when the state court has already undertaken a comparative juror analysis for some prospective jurors; even if the panel considered these additional jurors in the first instance, the comparisons do not provide sufficient evidence of pretext to render the California Supreme Court's ultimate factual determination objectively unreasonable.

Stevens claimed that the prosecutor engaged in purposeful discrimination when he struck Clemons. The panel held that in rejecting this claim, the California Supreme Court reasonably determined that the record supports the prosecutor's statement that Clemons was ambivalent as to her willingness to impose the death penalty. The panel also held that the California Supreme Court's determination that the prosecutor's strike of Clemons was not pretextual is not objectively unreasonable.

Stevens claimed that the prosecutor acted with discriminatory intent in striking Hill. The panel held that the California Supreme Court reasonably determined that the record supports the prosecutor's stated reasons for striking Hill, who showed ambivalence to the death penalty and was self-identified as alcoholic. The panel wrote that the trial court's failure to confirm that Hill smelled of alcohol in the courtroom was irrelevant, and that a comparative juror analysis and other circumstantial evidence against Hill does not support Stevens's arguments.

Stevens argued that the district court erred in concluding that he failed to exhaust his claims relating to the strikes of

the four remaining black prospective jurors, or alternatively, in failing to stay the case and hold it in abeyance to permit exhaustion. The panel did not need to reach the exhaustion issue because, even under a de novo review on the merits, the panel concluded that the prosecutor's race-neutral justifications for striking those four prospective jurors are supported by the record and not belied by any comparative juror analysis.

Stevens argued under 28 U.S.C. § 2254(d)(1) that the California Supreme Court's rejection of his *Batson* claims was contrary to or an unreasonable application of *Batson* and other Supreme Court precedent.

The panel rejected Stevens's argument that the California Supreme Court unreasonably applied *Batson* by failing to consider sua sponte all of the struck prospective black jurors and compare them with all of the prospective nonblack jurors who were not struck. The panel wrote that although *federal* courts must perform a comparative juror analysis advanced by a state prisoner, even if the state reviewing court has not done so, the Supreme Court has not established that state reviewing courts have such an obligation.

The panel rejected Stevens's argument that the California Supreme Court's decision was contrary to *Miller-El v. Cockrell*, 537 U.S. 322 (2003), and *Miller-El v. Dretke*, 545 U.S. 231 (2005), because the facts are materially indistinguishable from the facts in those cases. The panel wrote that the California Supreme Court could have made a principled distinction between the cases. The panel wrote that there is a principled distinction as well between this case and *Flowers v. Mississippi*, 139 S. Ct. 2228 (2019), which

was in any event not clearly established as of the time the state court rendered its decision in this case.

The panel rejected Stevens's argument that the California Supreme Court applied an erroneous legal standard by stating that the seated jurors identified by Stevens did not show a "striking similarity" in ambivalence to struck prospective jurors.

## COUNSEL

Brian M. Pomerantz (argued), Law Offices of Brian M. Pomerantz, Carrboro, North Carolina; Richard A. Tamor, Tamor & Tamor, Oakland, California; for Petitioner-Appellant.

Sarah J. Farhat (argued), Deputy Attorney General; Alice B. Lustre, Supervising Deputy Attorney General; James W. Bilderback III, Senior Assistant Attorney General; Rob Bonta, Attorney General; Attorney General's Office, California Department of Justice, San Francisco, California; for Respondent-Appellee.

**OPINION**

IKUTA, Circuit Judge:

A California jury convicted Charles Stevens of four murders and six attempted murders and sentenced him to death. Stevens claims that the prosecutor's decision to strike black prospective jurors constituted purposeful discrimination on the basis of race, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). The California Supreme Court rejected these claims on direct appeal. *People v. Stevens*, 41 Cal. 4th 182 (2007). Reviewing the California Supreme Court's determination under 28 U.S.C. § 2254, we affirm the judgment of the district court denying Stevens's habeas claims.

I

A

In the four months between April and July 1989, Stevens randomly shot at people on or near Interstate 580 in Oakland. This shooting spree left four people dead and six people injured. *Stevens*, 41 Cal. 4th at 187.[1]

His final attacks took place in the early morning hours of July 27, 1989. At that time, Rodney Stokes was driving home from work on Interstate 580. *Id.* Stevens pulled up alongside his vehicle, and Stokes lowered his passenger window to see

---

[1] During his shooting spree, Stevens killed Leslie Ann Noyer, Lori Anne Rochon, Laquann Sloan, and Raymond August, and attempted to kill Karen Alice Anderson, Janell Lee, Julia Peters, Paul Fenn, Upendra de Silva, and Rodney Stokes. *Stevens*, 41 Cal. 4th at 187.

if he knew the driver. Stevens motioned to get Stokes's attention, smiled at him, and then shot at him. *Id*. at 187–88. As Stokes struggled to regain control of his car, Stevens shot at Stokes twice more. *Id.* at 188. Stevens then pulled away. *Id.*

Trailing Stevens, Stokes saw Stevens pull alongside Raymond August's car and slow down. *Id.* Stokes saw both cars' brake lights come on and heard "at least two gunshots." *Id.* August's car crashed into a pillar under an overpass, and he died at the scene. *Id.* Stevens exited the freeway and reentered the freeway going in the opposite direction before stopping near the scene. *Id.* Stokes called 911. *Id.* When police arrived, they found Stevens, still parked, watching the scene of August's murder. *Id.* Stevens attempted to flee, and when an officer grabbed him, "a heavy metallic object hit the ground." *Id.* The object was a loaded .357 magnum Desert Eagle semiautomatic pistol which was later proven to be "either a match to or consistent with the gun used" in all but one of the crimes. *Id.* Stevens was also carrying a loaded magazine and a loose bullet. *Id.*

A subsequent search of Stevens's apartment revealed a box and a manual for the pistol, a gun case, gun cleaning equipment, a cartridge, a pistol magazine, bullets, and practice targets. *Id.* at 189. The search also discovered "a collection of Oakland newspapers containing articles about the shootings" and "an envelope with handwritten references to what appeared to be various Penal and Vehicle Code sections including those regarding murder, assault, vehicle theft, and weapons offenses." *Id.*

Stevens was charged with multiple first degree murders with special circumstances. Richard Clark stood trial with

Stevens as a co-defendant for one murder—the shooting of Leslie Noyer. *Id.* at 187. Clark told the police that "he had shot Noyer under duress because [Stevens] threatened to shoot him," but at trial "denied being present at the murder scene." *Id.* at 189.

During voir dire and jury selection in December 1992 and January 1993, Stevens's counsel brought or joined four motions under *People v. Wheeler*, 22 Cal. 3d 258 (1978).[2] These motions asserted that the prosecutor purposefully discriminated when he used peremptory challenges to excuse black prospective jurors. *See Stevens*, 41 Cal. 4th at 192. The trial court denied all four motions, and the empaneled jury included one black juror and one black alternate. *Id.*[3]

Clark, Stevens's co-defendant, brought the first *Wheeler* motion after the prosecutor used his twelfth peremptory challenge to excuse prospective juror Walter Simpson. Stevens joined that motion. Defense counsel argued that the prosecutor had impermissibly struck four black prospective jurors: Henry Hill, Larry Foster, Jean Clemons, and Simpson. The trial court found that defense counsel established a prima

---

[2] *Wheeler* is California's procedural equivalent to an objection under *Batson v. Kentucky*, 476 U.S. 79 (1986), and serves as an implicit objection under *Batson*. *Sifuentes v. Brazelton*, 825 F.3d 506, 514 n.1 (9th Cir. 2016).

[3] Prospective jurors used different terms to identify themselves on their juror questionnaires, such as "BLACK," "BLK," "African American," and "Afro-American." Following *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 242 (2005), we use the word "black" to describe these prospective jurors, and refer to prospective jurors who are not black as "nonblack."

facie case of discrimination under *Wheeler* and asked the prosecutor to state his justifications for the strikes.

In response, the prosecutor stated that the four prospective jurors "indicated in one way or another at the very least an ambivalence and the lack of commitment, at least in my mind, of their willingness to impose the death penalty." The prosecutor offered more specific reasons for striking each prospective juror, which we discuss in more detail below.

The trial court recessed briefly to review its notes. After "an analysis of the proffered reasons and the court's own observations," the trial court denied the *Wheeler* motion and found that the prosecution "met its burden to rebut the inference of group bias" as to the four black prospective jurors. Jury selection resumed.

The prosecutor then used peremptory challenges to excuse three other black prospective jurors, Patricia King, Sarah McCall, and Joyce Gray. After each strike, defense counsel made a *Wheeler* motion. As explained in more detail below, the prosecutor indicated his decision in each case was based on the prospective juror's ambivalence and the prosecutor's uncertainty about the juror's ability to impose the death penalty. The trial court considered "the arguments of counsel and also my own observations and recollection[s] of this juror" in each case, and concluded that the prosecutor met his burden to rebut the inference of discrimination under *Wheeler*.

In March 1993, the jury convicted Stevens. The jury found the special circumstances that Stevens killed his final victim while lying in wait and that Stevens committed multiple murders. *Id.* The court declared a mistrial for Clark.

*Stevens*, 41 Cal. 4th at 187. At the penalty phase, the jury voted in favor of the death penalty, and the trial court sentenced Stevens to death. *Id.*

B

In his direct appeal to the California Supreme Court, Stevens argued that the trial court erred in denying his *Wheeler* motions. *Stevens*, 41 Cal. 4th at 187. Stevens's brief focused on the strikes of Hill, Foster, and Clemons. Although Stevens mentioned the strikes of four other prospective jurors in his brief,[4] the California Supreme Court concluded that Stevens challenged "only the ruling on the first motion" (relating to the strikes of Hill, Foster, Clemons, and Simpson) on direct appeal. *Id.* at 192. Considering only the strikes against Hill, Foster and Clemons (Stevens did not provide separate arguments about Simpson), the California Supreme Court determined that nothing in the record indicated "that pretext is evident" in the prosecutor's stated justifications for striking the three prospective jurors. *Id.* at 196–198. Deferring to the trial court's credibility determination, the California Supreme Court concluded that Stevens "failed to demonstrate purposeful racial discrimination against prospective jurors." *Id.* at 198. Stevens sought review from the United States Supreme Court, which denied Stevens's petition for writ of certiorari. *Stevens v. California*, 552 U.S. 1118 (2008).

---

[4] Stevens's brief to the California Supreme Court includes a section titled "Factual Background," which identified four separate *Wheeler* motions: the first motion related to the strikes of Hill, Foster, Clemons and Simpson, and the three subsequent motions relating to the strikes of King, McCall and Gray. In the sections setting out his legal arguments, Stevens specifically addressed only the strikes of Hill, Foster, and Clemons.

While Stevens's direct appeal was pending, he filed a petition for habeas relief with the California Supreme Court. Among other claims, Stevens alleged ineffective assistance of trial counsel in failing to perform a comparative juror analysis in the trial court to support his *Wheeler* claim. The California Supreme Court denied the habeas petition largely on the merits, including ineffective assistance of trial counsel.

C

Stevens sought federal habeas relief in district court. The May 2014 amended petition is the operative petition here. In his petition, Stevens challenged (among other things) the California Supreme Court's rejection of his claim that the prosecutor's use of seven peremptory challenges against black prospective jurors was an unreasonable application of *Batson v. Kentucky*, 476 U.S. 79 (1986). In January 2019, the district court denied all of Stevens's claims, but granted a certificate of appealability on his *Batson* claims.

Stevens timely appealed, and the district court entered a stay of execution pending appeal.

II

On appeal, Stevens raises three main arguments. First, he claims that the California Supreme Court made an unreasonable determination of the facts in upholding the trial court's conclusion that the prosecutor did not purposefully discriminate in striking Foster, Clemons and Hill. Second, Stevens claims that the California Supreme Court erred in failing to address his claims that the prosecutor violated *Batson* in striking Simpson, King, McCall, and Gray, and urges us to review these claims de novo. Finally, Stevens

argues that the California Supreme Court's rejection of his *Batson* claims was contrary to or an unreasonable application of *Batson* and other Supreme Court precedent. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253(a). We review de novo the district court's denial of a habeas petition under 28 U.S.C. § 2254.

A

Our review of Stevens's arguments requires an understanding of both our framework for adjudicating *Batson* claims and the doubly deferential standard applied in reviewing a habeas petition raising a *Batson* challenge under § 2254(d)(2).

Under *Batson*, "the State's privilege to strike individual jurors through peremptory challenges . . . is subject to the commands of the Equal Protection Clause," which "forbids the prosecutor to challenge potential jurors solely on account of their race." 476 U.S. at 89. "[A]s in any case alleging a violation of the Equal Protection Clause," a criminal defendant bears the "burden of proving purposeful discrimination on the part of the State." *Id.* at 90.

We employ a three-step burden-shifting framework regarding the claimed equal protection violation on a strike-by-strike basis. 476 U.S. at 90, 93–94, 96 n.18 & 97–98. First, the defendant must make "a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race." *Rice v. Collins*, 546 U.S. 333, 338 (2006). If the defendant makes such a showing, then "the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question." *Id.* Third, the trial court must evaluate "'the persuasiveness of the justification' proffered

by the prosecutor" and "determine whether the defendant has carried his burden of proving purposeful discrimination." *Id.* (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995)).

The trial court's determination as to whether the prosecutor purposefully discriminated "turns on evaluation of credibility." *Sifuentes v. Brazelton*, 825 F.3d 506, 515 (9th Cir. 2016) (quoting *Batson*, 476 U.S. at 98 n.21) (alteration adopted). Such a credibility determination is a "pure issue of fact." *Id.* (quoting *Hernandez v. New York*, 500 U.S. 352, 364–65 (1991)). The trial court evaluates "the prosecutor's state of mind based on demeanor and credibility." *Id.* (quoting *Hernandez*, 500 U.S. at 365). In evaluating the prosecutor's rationale for striking a prospective juror, the trial court may also take into account its own observations of the prospective juror. *See Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (explaining importance of "trial court's firsthand observations" in resolving *Batson* claims). The trial court's assessments "are often based on subtle impressions and intangible factors," *Davis v. Ayala*, 576 U.S. 257, 285 (2015), including a prospective juror's "tone, demeanor, facial expression, emphasis—all those factors that make the words uttered by the prospective juror convincing or not," *Sifuentes*, 825 F.3d at 516 (quoting *Burks v. Borg*, 27 F.3d 1424, 1429 (9th Cir. 1994)).

In considering a prosecutor's credibility, the trial court "must undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Batson*, 476 U.S. at 93 (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)). Different types of evidence may raise an inference that the prosecutor's race-neutral explanation for striking a juror was pretextual. For example, a prosecutor's "implausible or fantastic"

justifications of strikes that are not supported by the record may raise an inference of pretext. *Sifuentes*, 825 F.3d at 516 (citing *Purkett*, 514 U.S. at 768). Additionally, a prosecutor's mischaracterization of a prospective juror's testimony "in a manner completely contrary to the juror's stated beliefs" on the record may raise such an inference. *Id.* (quoting *Aleman v. Uribe*, 723 F.3d 976, 982 (9th Cir. 2013)).

Courts may also infer pretext where a prosecutor "gives a race-neutral reason for striking a proposed juror, but has allowed jurors with similar characteristics to be empaneled." *Id.* (citing *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 241 (2005)). In considering this evidence of pretext, a court may engage in a comparative juror analysis, which involves "side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve." *Miller-El II*, 545 U.S. at 241. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Id.* But there is no "bright line rule" that a particular strike must be deemed purposefully discriminatory "when 'prospective jurors of different races provide similar responses and one is excused while the other is not,'" *Sifuentes*, 825 F.3d at 516 (quoting *Burks*, 27 F.3d at 1429). In capital cases, the Supreme Court has acknowledged that the prosecutor's "fine judgment calls about which jurors are more or less willing to vote for the ultimate punishment" requires a "comparison of responses that differ in only nuanced respects, as well as a sensitive assessment of jurors' demeanor." *Ayala*, 576 U.S. at 273.

In considering whether a prosecutor purposefully discriminated on the basis of race when striking a juror,

courts also consider "evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case." *Ervin v. Davis*, 12 F.4th 1102, 1106 (9th Cir. 2021) (citing *Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019)). As explained in *Miller-El v. Cockrell* (*Miller-El I*), "if the use of disparate questioning is determined by race at the outset, it is likely [that] a justification for a strike based on the resulting divergent views would be pretextual. In this context the differences in the questions posed by the prosecutors are some evidence of purposeful discrimination." 537 U.S. 322, 344 (2003).

Finally, courts may also consider statistical evidence showing the use of peremptory challenges bears more heavily on one race than others, "evidence of a prosecutor's disparate questioning and investigation" of black and white prospective jurors, and the "relevant history of the State's peremptory strikes in past cases." *Flowers*, 139 S. Ct. at 2243.

Overall, trial courts are "best situated" to resolve questions of credibility, and the Supreme Court has recognized that such issues "lie peculiarly within a trial judge's province." *Ayala*, 576 U.S. at 273–74 (quoting *Snyder*, 552 U.S. at 477); *see also Flowers*, 139 S. Ct. at 2243 ("[T]he job of enforcing *Batson* rests first and foremost with trial judges."). For these reasons, reviewing courts must give "great weight" to the credibility findings of trial courts. *Ayala*, 576 U.S. at 285–86. On direct review, "in the absence of exceptional circumstances," appellate courts "defer to the trial court" because "[a]ppellate judges cannot on the basis of a cold record easily second-guess a trial judge's decision about likely motivation." *Id.* at 274. We therefore uphold *Batson* rulings absent clear error. *Snyder*, 552 U.S. at 477.

The Supreme Court has indicated that appellate courts must be cautious in capital cases not to "second-guess a trial judge's decision" on the basis of a "cold record." *See Ayala*, 576 U.S. at 273–74 (cleaned up). As the Supreme Court has explained, "[i]n a capital case, it is not surprising for prospective jurors to express varying degrees of hesitancy about voting for a death verdict." *Id.* at 273. This is because "[f]ew are likely to have experienced a need to make a comparable decision at any prior time in their lives." *Id*. In exercising peremptory strikes against such jurors, "both the prosecution and the defense may be required to make fine judgment calls about which jurors are more or less willing to vote for the ultimate punishment." *Id.* "These judgment calls may involve a comparison of responses that differ in only nuanced respects" and may involve "a sensitive assessment of jurors' demeanor." *Id.*

B

In this case, we are not directly reviewing the California Supreme Court's decision but instead reviewing it through the deferential lens of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d).[5] Where

---

[5] 28 U.S.C. § 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

AEDPA's "highly deferential standard" applies, it "demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).  Our role on federal habeas review is "to guard against extreme malfunctions in the state criminal justice systems, not to apply *de novo* review of factual findings and to substitute [our] own opinions for the determination made on the scene by the trial judge." *Ayala*, 576 U.S. at 276 (cleaned up).

Under § 2254(d)(1), we must determine whether the California Supreme Court's adjudication of Steven's claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law" according to Supreme Court precedent.  A state court's decision is "contrary to" Supreme Court precedent if the state reviewing court "arrives at a conclusion opposite to that reached by" the Supreme Court "on a question of law or if the state court decides a case differently than the Supreme Court "on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).  A state court's decision is an "unreasonable application of" Supreme Court precedent if the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *see also Hooper v. Shinn*, 985 F.3d 594, 614 (9th Cir. 2021) (same).  We review the

established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

state reviewing court's decision only in light of law clearly established by the Supreme Court at the time of the last reasoned state court's decision. *See Hooper*, 985 F.3d at 614.

In considering whether a state court's decision is "contrary to" or "an unreasonable application of" *Batson* under § 2254(d)(1), we have recognized that *Batson* clearly establishes the requirement that courts perform a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Murray v. Schriro*, 745 F.3d 984, 1004 (2014) (quoting *Batson*, 476 U.S. at 93). State courts disobey this clearly established requirement if they "'rubberstamp' a prosecutor's proffered race-neutral explanation for exercising a disputed peremptory strike," or "misstate[] the test," or "impermissibly rel[y] on an erroneous factor." *Id.* at 1005. But *Batson* does not "specify the *form* of the trial court's inquiry into the prosecutor's motive." *Id.* at 1004. Thus, *Murray* explained that "[n]either *Batson* nor the Supreme Court cases following it clearly establish that trial courts must conduct a formal comparative analysis." *Id.*

Under § 2254(d)(2), we must determine whether the California Supreme Court's adjudication of Steven's claims was an "unreasonable determination of the facts." The factual determination primarily at issue is whether the prosecutor engaged in purposeful discrimination when striking a black juror. *See Sifuentes*, 825 F.3d at 517. In considering whether a state court's decision was based on an unreasonable determination of the facts, "a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." *Id.* (quoting *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004), *overruled on other grounds*, *Murray*, 745 F.3d

at 999–1000).    This standard is met when the record "compel[s] the conclusion that the trial court had no permissible alternative but to reject the prosecutor's race-neutral justifications" and find a *Batson* violation. *Collins*, 546 U.S. at 341.  Any factual findings underlying the trial court's determination regarding a prosecutor's credibility are presumed correct, and the petitioner has the burden of rebutting that presumption by clear and convincing evidence.[6] *See* 28 U.S.C. § 2254(e)(1); *see also Ayala*, 576 U.S. at 271.

When the highly deferential AEDPA standard combines with the already deferential standard used to review *Batson* claims on direct review, "we end up with a standard of review that is 'doubly deferential.'" *Sifuentes*, 825 F.3d at 518 (quoting *Briggs v. Grounds*, 682 F.3d 1165, 1170 (9th Cir. 2012)); *see Jamerson v. Runnels*, 713 F.3d 1218, 1225 (9th Cir. 2013).

---

[6] Under 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct" in a federal habeas proceeding, and the defendant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  By its terms, § 2254(e)(1) applies to the question whether the prosecutor purposefully discriminated when striking jurors, which is a "pure issue of fact," *Hernandez*, 500 U.S. at 364.  Nevertheless, the Supreme Court has left open the question of how § 2254(e)(1) interacts with § 2254(d)(2), *see Brumfield v. Cain*, 576 U.S. 305, 322 (2015) ("We have not yet defined the precise relationship between § 2254(d)(2) and § 2254(e)(1)."). Rather than resolve this issue in the *Batson* context, we have previously, in an "abundance of caution," applied § 2254(d)(2)'s standard to state court adjudications of *Batson* purposeful discrimination claims.  *See Sifuentes*, 825 F.3d at 517 n.3.  We do the same here.  We also apply § 2254(e)(1)'s clear and convincing evidence standard to the additional *Batson* challenges that the California Supreme Court did not review on the merits, although we decline to resolve the question whether § 2254(d)(2) applies to such claims.  *See infra* at 45–46.

Under this doubly deferential standard, we ask whether the state appellate court unreasonably determined, as an issue of fact, that the trial court did not clearly err in its credibility determination. In evaluating whether the state appellate court's deference to the trial court was objectively unreasonable, we recognize the deference owed "to the trial court's determination of the prosecutor's credibility," *Sifuentes*, 825 F.3d at 518, but "use ordinary analytic tools to evaluate the prosecutor's race-neutral explanations," *id.*, and "conduct a comparative juror analysis in the first instance if the state reviewing court has not done so," *id.* at 518 n.4; *see also Jamerson*, 713 F.3d at 1225. But "[e]ven if we would have reached a different conclusion regarding the prosecutor's credibility, we must give the state appellate court the benefit of the doubt and may not grant the habeas petition unless the state court's decision was 'not merely wrong, but actually unreasonable.'" *Sifuentes*, 825 F.3d at 518 (quoting *Taylor*, 366 F.3d at 999) (citation omitted). In sum, under AEDPA, "unless the state appellate court was objectively unreasonable in concluding that a trial court's credibility determination was supported by substantial evidence, we must uphold it." *Sifuentes*, 825 F.3d at 518 (quoting *Briggs*, 682 F.3d at 1170).

III

We now turn to Stevens's arguments on appeal. Stevens first argues that the California Supreme Court's rejection of his *Batson* claims was an objectively unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2). As required by *Batson*, we consider these claims on a strike-by-strike basis, in light of "all of the relevant facts and circumstances." *Flowers*, 139 S. Ct. at 2243. We first consider the prosecutor's strikes of Foster, Hill, and Clemons

under the doubly deferential standard of § 2254(d)(2).  We then review the strikes of the remaining prospective jurors not expressly addressed by the California Supreme Court.

A

We begin with Stevens's challenge to the prosecutor's strike of Foster.  Stevens argues that the prosecutor's nondiscriminatory reasons for challenging Foster were not supported by the record, because the prosecutor mischaracterized Foster's responses, and because the prosecutor's nondiscriminatory reason for striking Foster applied just as well to other members of the venire accepted by the prosecutor.  We conclude that Stevens fails to show that the California Supreme Court reached an objectively unreasonable factual determination on this claim.

In responding to the *Wheeler* challenge regarding Foster, Clemons, Hill and Simpson, the prosecutor stated generally that these individuals indicated "at the very least an ambivalence and the lack of commitment, at least in my mind, of their willingness to impose the death penalty." Specifically as to Foster, the prosecutor stated:

> [H]e too reflected an ambivalence in his ability to carry forthwith the death penalty, while in the questionnaire, he indicated he was moderately for it.  When it came down to whether or not he would vote for it if the issue were on the ballot, he said, "I honestly don't know."  And in talking with him, he said, "Well, I'll follow the law with regard to whatever the judge tells me."

> And when you put it in terms that, well, the
> law doesn't mandate that you have to impose
> the death penalty, that's something that's up
> to you.    He indicated, again, just an
> ambivalence in his ability and showed a lack
> of commitment in the ability to impose the
> death penalty.

In other words, the prosecutor's stated justification was
Foster's "ambivalence in his ability to carry forthwith the
death penalty" and "a lack of commitment in the ability to
impose the death penalty."

The trial court did not give a separate explanation for
rejecting each of Stevens's claims as to the strikes of the four
black prospective jurors, but stated generally that after "an
analysis of the proffered reasons and the court's own
observations," it determined that the prosecution "met its
burden to rebut the inference of group bias."

On review, the California Supreme Court concluded that
the record supported the prosecutor's characterization of the
record and that Foster's ambivalent responses did "not
undermine the prosecutor's stated reason." *Stevens*, 41 Cal.
4th at 194.    The California Supreme Court considered
Stevens's arguments based on comparisons between
prospective jurors struck by the prosecutor (Foster, Hill, and
Clemons) and seated nonblack jurors identified by Stevens,
and explained that the seated jurors did not "demonstrate such
a striking similarity in ambivalence regarding the death

penalty that a finding of pretext is warranted." *Id.* at 196.[7] As explained below, we conclude that the California Supreme Court's determination regarding Foster was not objectively unreasonable.

1

We first consider Stevens's argument that the prosecutor mischaracterized Foster's testimony as being ambivalent toward the death penalty. A review of the record shows that the California Supreme Court reasonably determined that the prosecutor did not do so.

Foster stated in his questionnaire that he was "moderately in favor" of the death penalty as a matter of philosophical opinion. In answer to a question on the jury questionnaire about how he would vote if the death penalty was on the ballot, he marked "[n]ot sure" and added, "I honestly don't know." During voir dire, when asked if he would vote for the death penalty on the ballot, Foster stated "Yes . . . I believe it's a deterrent." When the prosecutor drew a comparison between abstract support for the death penalty when people "read about the crimes in the newspaper" and the difficulty posed when people must look at a "real person" to sentence

---

[7] The California Supreme Court used first and last initials to compare "Prospective Jurors H.H., L.F., and J.C." with "seated Jurors D.M., J.C., M.F., and V.W." *Stevens*, 41 Cal. 4th at 196. These initials correspond respectively to Henry Hill, Larry Foster, Jean Clemons, Dana Mercie, James Collondrez, Marlene Favareille, and Virginia Watkins. Stevens argues that the California Supreme Court's analysis was "so wanting that the opinion confusingly identified both seated jurors Collondrez and Clemons as 'J.C.'" No such confusion exists. The California Supreme Court expressly referred to Jean Clemons as "*Prospective* Juror J.C." and James Collondrez as "*Juror* J.C." *See* 41 Cal. 4th at 198.

to death, Foster acknowledged the difficulty of such a scenario:

> Well, you're right.  At one time I thought that way, I really don't — I didn't like the death penalty.  But I find I can follow — if the law says that's what it is, I can follow the law.  I'd do what the law says and if it — if — if the law says this man gets the death penalty, this man doesn't, I could do that.

It was not objectively unreasonable for the California Supreme Court to conclude that these varying responses reflect ambivalence.

Stevens also claims that the prosecutor misquoted Foster's statement that he would "do what the law says" because the prosecutor paraphrased Foster as saying "Well, I'll follow the law with regard to whatever the judge tells me."  We reject this argument.  While the prosecutor did not give a direct quote, the prosecutor's paraphrase was materially the same, and to the extent the quotation was inaccurate, it did "nothing to change the basis for the strike," *Jamerson*, 713 F.3d at 1232 n.7.

Given the evidence supporting the prosecutor's explanation for striking Foster, the California Supreme Court's determination that the prosecutor had not mischaracterized Foster's testimony "in a manner completely contrary to the juror's stated beliefs," *Sifuentes*, 825 F.3d at 516 (quoting *Aleman*, 723 F.3d at 982), was not an unreasonable determination of the facts.

2

We next consider Stevens's argument that the prosecutor purposefully discriminated here because his nondiscriminatory reason for striking Foster applied just as well to other members of the venire whom the prosecutor did not strike. In raising this argument to the California Supreme Court, Stevens compared Foster to four nonblack prospective jurors: Mercie, Collondrez, Favareille, and Watkins.

The California Supreme Court concluded that Stevens had not demonstrated that those four jurors had "such a striking similarity in ambivalence regarding the death penalty that a finding of pretext is warranted." *Stevens*, 41 Cal. 4th at 196–98. Supporting this conclusion, the California Supreme Court stated that, according to the juror questionnaire, Watkins agreed with the decision to remove Chief Justice Bird from the California Supreme Court,[8] voted for the death penalty, and was moderately in favor of the death penalty. *Id.* at 196. Mercie gave responses that "indicate[d] an appreciation that voting for a death verdict is a grave decision, not ambivalence regarding the death

---

[8] Chief Justice Bird was the object of a "strenuous and well publicized campaign" in 1986 to unseat her in a retention election. The successful campaign focused on "the high percentage of death penalty reversals and the claim that, led by the Chief Justice, [the California Supreme Court] was intentionally evading the law in refusing to affirm more of those decisions and allow executions to recommence. Regardless of their political interest or inclination, few citizens of the state could have been unaware of the situation or the circumstances prompting these efforts." *People v. Cox*, 53 Cal. 3d 618, 696 (1991). A prospective juror's support for Chief Justice Bird's removal could therefore be viewed as raising the reasonable inference that the prospective juror also supports the death penalty.

penalty." *Id.* at 197. Collondrez stated that the death penalty "is needed," even though he would want to read more on the issue first before voting for it on the ballot, and he could cast a twelfth vote for death. *Id.* at 197–98. Favareille was neutral on the death penalty and advocated for a "case-by-case" approach, but said she could cast a twelfth vote for death. *Id.* at 198. The California Supreme Court therefore rejected Stevens's argument.

The California Supreme Court's ruling is not an objectively unreasonable determination of the facts. Although each of these nonblack prospective jurors at times expressed some degree of ambivalence toward imposing the death penalty, their overall expressions were not so similar to Foster's that we can say that the California Supreme Court was objectively unreasonable in upholding the trial court's factual finding. Stevens points out that Foster made discrete statements that were similar to statements made by these named nonblack jurors. But in a comparative juror analysis, a court does not compare only specific statements; instead it must look to "the overall tenor" of a prospective juror's responses in evaluating the prosecutor's justification, *see Mayes v. Premo*, 766 F.3d 949, 961 n.16 (9th Cir. 2014). This focus takes on particular importance when the justification offered is one so broad as ambivalence toward the death penalty and the ability to vote for death, which may be exhibited through demeanor and subtly different responses. *See Ayala*, 576 U.S. at 273–74.

For the first time on collateral review, Stevens also compares Foster to a number of additional prospective jurors. Although Stevens refers briefly to a long list of prospective jurors as evidence of pretext, he focuses on Edward Newbegin, Armond Jordan, Edward Prodger, and Mary

Domenichelli.**⁹**   The California Supreme Court did not
undertake a comparative juror analysis as to these prospective
jurors.   We have not previously addressed the question
whether we must consider additional prospective jurors raised
for the first time on collateral review when the state court has
already undertaken a comparative juror analysis for some
prospective jurors.   *Cf. Sifuentes*, 825 F.3d at 518 n.4
(holding that, where the state court undertakes no
comparative juror analysis at all, we must do so "in the first
instance"); *see also Jamerson*, 713 F.3d at 1225.   We need
not resolve that question here.   Even if we consider these
additional jurors in the first instance, we see no basis for
habeas relief.

Each of these prospective jurors expressed some
ambivalence regarding imposing the death penalty, but the
comparisons do not provide sufficient evidence of pretext to
render the California Supreme Court's ultimate factual
determination objectively unreasonable.   Newbegin stated in
his questionnaire that he was "[m]oderately in favor" of the
death penalty philosophically.   In response to subsequent
questions on voir dire, he indicated that his abstract support
for the death penalty would translate into a vote to sentence
Stevens to death if the evidence warranted it.**¹⁰**   Jordan, who

---

**⁹** Stevens briefly mentions Catherine Riehl, Almeta Persons, Sheri
Banks, Leigh Irwin, Rodolfo Salazar, and Wallace Gobin.   We conclude
that the responses from these panelists are substantially different from
Foster's responses, and therefore do not merit significant discussion.

**¹⁰** Specifically, when asked during voir dire about the difficulty of
translating abstract support for the death penalty into a vote to sentence
Stevens to death, Newbegin responded that his "objectivity doesn't suffer
as to whether it's a philosophical or a real question" and that he didn't
"see any difference."

was struck by Clark, stated during voir dire that he would vote yes on the ballot for the death penalty, and he explained that "certain crimes, you should have a death penalty for." Jordan also had a brother-in-law in a "high ranking position" at the district attorney's office and a brother-in-law who was a deputy sheriff involved in Stevens's case. Prodger stated in his questionnaire that he would vote for the death penalty on the ballot because he felt "it would be helpful, *if* the laws weren't so complicated." Asked about this answer during voir dire, Prodger expressed impatience with the delays on death row. And Prodger expressed the belief that he was beginning to think the defendants were guilty simply because of voir dire's focus on penalty issues. The responses from these prospective jurors evince significantly less ambivalence toward the death penalty than did Foster's.

The record shows that the third alternate juror, Mary Domenichelli, evinced an ambivalence toward the death penalty and a conditional willingness to vote for that penalty which were fairly similar to Foster's. Domenichelli described her general feelings on the death penalty by explaining that, "[g]rowing up Catholic," she "was probably opposed" but was "no longer a practicing Catholic" and so she "believe[d] there are cases where death penalty is appropriate." She was philosophically "[n]eutral" on the death penalty but added that she had "become more tolerant of death penalty in recent years." Like Foster on his questionnaire, she was not sure how to vote on the ballot for the death penalty. During voir dire, Domenichelli acknowledged that she was "nervous" about "having that kind of, not authority, if you will, but the kind of possibility, judgment" to vote for death. She added that she was "very uneasy about it" and "would rather not have to be in a position to make that kind of a judgment."

Asked by the court whether she could vote for death, Domenichelli responded, "I think I could."

Reasonable minds could disagree as to whether Foster expressed greater ambivalence regarding the death penalty than Domenichelli. But we are not making de novo determinations here; rather, we must evaluate whether the California Supreme Court's deference to the trial court's conclusion that the prosecutor was credible was an objectively unreasonable determination of the facts. We conclude it was not. First, it was proper for the California Supreme Court to refrain from second guessing a trial judge's decision in a close case, given the Supreme Court's determination that the trial court was best positioned to determine the prosecutor's credibility. *See Ayala*, 576 U.S. at 274; *see also Sifuentes*, 825 F.3d at 515–16. Second, as the Supreme Court has explained, the prosecutor and the trial court both had to make "fine judgment calls" about ambivalence that were based on "a comparison of responses that differ[ed] in only nuanced respects" and a "sensitive assessment of jurors' demeanor." *Ayala*, 576 U.S. at 273. Unlike cases where the prosecutor's reason for striking a prospective juror is fairly specific—such as whether a prospective juror had competing work obligations, *Flowers*, 139 S. Ct. at 2249–50, knew people who were involved in the crime, *Foster v. Chatman*, 136 S. Ct. 1737, 1750 (2016), or was divorced, *see, e.g.*, *Snyder*, 552 U.S. at 484—the California Supreme Court had to evaluate the prosecutor's assessment of relative degrees of ambivalence, a much more difficult task.

Therefore, given our standard of review, we conclude that the California Supreme Court's determination that the prosecutor's reasons for striking Foster were not pretextual

was not an objectively unreasonable determination of the facts in the record.  28 U.S.C. § 2254(d)(2).  We therefore reject Stevens's argument that the prosecutor was not credible because he accepted other prospective jurors who expressed ambivalence similar to that expressed by Foster.

3

For the first time on appeal, Stevens now points to other evidence in the record to support his argument that the California Supreme Court's decision to uphold the trial court's credibility determination regarding Foster was an unreasonable determination of the facts.[11]

First, Stevens points to record evidence that the prosecutor used peremptory strikes to remove 78 percent of the eligible black prospective jurors that he had a chance to strike.[12]     Evidence that a prosecutor struck a

---

[11] For purposes of our analysis, we assume that under § 2254(d)(2), we may consider the entire record before the state court in deciding Stevens's claim, *see Miller-El II*, 545 U.S. at 240–41 & n.2, even though Stevens did not rely on this evidence in his habeas petition to the California Supreme Court.

[12] The parties dispute how to calculate the prosecutor's strike rate. Stevens maintains that it should be calculated as seven strikes against the nine black prospective jurors that the prosecutor had the chance to strike (78 percent), which would exclude Kenrick Lee, who was struck by Clark's counsel before the prosecutor had a chance to strike him.  The government argues instead that it should be calculated as seven strikes against the eleven black prospective jurors in the entire venire (63 percent).  We follow the Supreme Court's lead in using the number of black prospective jurors that a prosecutor could have struck or accepted as the denominator.  *See, e.g.*, *Flowers*, 139 S. Ct. at 2235, 2245.  This method of calculation removes Kenrick Lee from consideration of the

disproportionately high percentage of black prospective jurors compared to nonblack prospective jurors can support a prisoner's habeas challenge to a state court decision and may, in some cases, constitute a "critical fact[]" regarding discrimination. *See Flowers*, 139 S. Ct. at 2235, 2243. *Flowers* involved a "blatant pattern of striking black prospective jurors" in four trials of the same defendant, where the prosecutor attempted "to strike every single black prospective juror that it could have struck." *Id.* at 2245. On direct review, the Supreme Court has found purposeful discrimination where a prosecutor struck 83 percent of eligible black prospective jurors compared to 5 percent of nonblack prospective jurors. *See Flowers*, 139 S. Ct. at 2245. Nevertheless, neither the Supreme Court nor we have developed any bright line rule. *Compare Jamerson*, 713 F.3d at 1235 (rejecting *Batson* claim under § 2254(d)(2) with strikes against ten of twelve black prospective jurors); *Cook v. LaMarque*, 593 F.3d 810, 825–26 (9th Cir. 2010) (rejecting *Batson* claim under § 2254(d)(2) with strikes against seven of ten black prospective jurors); *Sifuentes*, 825 F.3d at 514 (rejecting *Batson* claim under § 2254(d)(2) with strikes against nine of twelve black prospective jurors), *with Kesser v. Cambra*, 465 F.3d 351, 357 (9th Cir. 2006) (en banc) (granting habeas relief with strikes against four of four minority prospective jurors); *Ali v. Hickman*, 584 F.3d 1174, 1176 (9th Cir. 2009) (granting relief with strikes against two of two black prospective jurors).

---

strike rate because Clark struck Lee before the prosecutor had a chance to strike Lee. We reject Stevens's attempt to excise Sheri Banks, an alternate juror not physically present during jury selection but accepted by the prosecutor, because Stevens merely speculates that the prosecutor either forgot Banks was black or "was likely unconcerned with alternates at all."

Here, the prosecutor struck 7 of 9 (78 percent) of the black prospective jurors that he had a chance to strike, while striking 13 of 49 (26.5 percent) nonblack prospective jurors called to the jury box. Three black prospective jurors were not struck by the prosecutor: seated juror Almeta Persons, alternate juror Sheri Banks, and Kenrick Lee, who was struck by Clark. While this record shows that the strikes of black prospective jurors were disproportional to the strikes of nonblack prospective jurors, the disproportionality is not as stark as in cases where the Supreme Court found purposeful discrimination. *See, e.g.*, *Miller-El II*, 545 U.S. at 241 (finding discriminatory intent in a case where the prosecutor struck 91 percent of eligible black prospective jurors compared to 13 percent of nonblack prospective jurors); *Flowers*, 139 S. Ct. at 2245 (finding discriminatory intent in a case where the prosecutor struck 83 percent of eligible black prospective jurors compared to 5 percent of nonblack prospective jurors). Therefore, while the disproportionate strike rate supports Stevens's argument that the prosecutor had a discriminatory intent, taken in the context of the record as a whole, it does not show that the California Supreme Court's affirmance of the trial court's credibility finding was an unreasonable determination of the facts.

Second, Stevens argues that there is evidence that the Alameda County District Attorney's office historically maintained a pattern or practice of purposeful discrimination. In support, Stevens points to a state court opinion, *In re Freeman*, 38 Cal. 4th 630 (2006), and two federal district court cases, *Mitcham v. Davis*, 103 F. Supp. 3d 1091 (N.D. Cal. 2015) and *Stanley v. Ayers*, No. 07-cv-04727-EMC, 2018 WL 4488298 (N.D. Cal. Sept. 17, 2018).

This argument is meritless for two reasons. First, in determining whether the California Supreme Court's decision "was based on an unreasonable determination of the facts," we are limited to "the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Stevens did not present any evidence supporting his pattern or practice claim to the California Supreme Court.[13]

Second, the legal opinions cited in Stevens's brief do not support Stevens's claim. In *Freeman*, the California Supreme Court concluded that an Alameda County prosecutor's claim that the District Attorney's office had a practice of discriminating against black and Jewish prospective jurors was not credible. 38 Cal. 4th at 644–45. Likewise, the federal district court decisions cited by Stevens do not hold that the Alameda County District Attorney's office engaged in such practices. In *Stanley*, the court granted a petitioner's motion for preservation of voir dire notes to support the

---

[13] After oral argument, Stevens submitted citations to several Ninth Circuit and district court opinions (all of which were issued after the California Supreme Court resolved Stevens's appeal) that refer to jury selection conducted by assistant district attorneys from Alameda County. In the majority of these cases, the court either did not reach the *Batson* issue or concluded that no *Batson* violation occurred. Stevens appears to offer the facts from these cases, as recited in the opinions' respective fact sections, as evidence supporting his argument that the Alameda County District Attorney's Office engaged in a practice of discrimination. Because we are limited to considering whether the state court's decision "was based on an unreasonable determination of the facts in light of the evidence *presented in the State court proceeding*," § 2254(d)(2) (emphasis added), and this evidence was not part of the record before the California Supreme Court, we may not consider it here. Stevens's reliance on *Ervin* is misplaced because *Ervin* does not (and could not) suggest that a district court considering a habeas petition under § 2254(d)(2) can consider evidence beyond that presented in state court. *See* 12 F.4th at 1107.

petitioner's claim that a prosecutor from the Alameda County District Attorney's Office had a pattern and practice of discrimination against black prospective jurors. *See* 2018 WL 4488298 at *1. In *Mitcham*, the court ruled that the petitioner had shown ineffective assistance of counsel, because his attorney had failed to raise a *Batson* challenge despite evidence that a prosecutor from the Alameda County District Attorney's office was purposefully striking black prospective jurors on the basis of their race. *See* 103 F. Supp. 3d at 1097. Neither opinion supports Stevens's claim that a different prosecutor in this case was operating under a general policy of discriminating against black prospective jurors.

Finally, Stevens asserts that the prosecutor's credibility is undermined due to the prosecutor's purposeful discrimination against Jewish prospective jurors. According to Stevens, the prosecutor was "literally whitewashing his strikes of African-American prospective jurors by comparing their strikes to white prospective jurors who were improperly being struck because they were Jewish." While Stevens's theory is not entirely clear, we understand him to be making the argument that a court should discount comparative evidence that the prosecutor struck nonblack prospective jurors on the same basis as black prospective jurors, if the nonblack prospective jurors were Jewish.[14] We reject this argument. First, Stevens has not established that the prosecutor purposefully discriminated against the six prospective jurors whom Stevens claims are Jewish. Indeed, limiting our analysis to

---

[14] In his reply brief, Stevens clarifies that he is not asserting a free-standing *Batson* claim based on the striking of Jewish jurors.

the record,[15] there is no evidence that the prosecutor even knew that two of the six jurors were Jewish, given that they did not identify as such in their questionnaires or in voir dire. Second, even if the prosecutor did purposefully discriminate against Jewish prospective jurors, Stevens does not explain how that would make the California Supreme Court's conclusion that the prosecutor did not purposefully discriminate against prospective black jurors an unreasonable determination of the facts.

B

We next turn to Stevens's argument that the California Supreme Court made an unreasonable determination of the facts in rejecting his claim that the prosecutor engaged in purposeful discrimination when he struck Jean Clemons.[16]

---

[15] Stevens relies in part on a declaration filed in an unrelated California Supreme Court case that provided a review of peremptory challenges exercised against Jewish prospective jurors by the Alameda County District Attorney's Office. Stevens also relies on a page "from the 1930 Census" to show that one venireperson, Arthur Wilner, who did not identify as Jewish was actually Jewish because his mother spoke Yiddish. Stevens did not present the census page or the declaration to the California Supreme Court. Accordingly, we reject this evidence because our analysis is limited to evidence presented in the state court proceedings. *See* 28 U.S.C. § 2254(d)(2).

[16] We limit our review to arguments raised in the opening and reply briefs filed by Stevens on appeal. We do not consider additional arguments that Stevens raised before the district court, because his mere reference to those arguments in his opening brief on appeal does not incorporate them for our review. *See* Ninth Circuit Rule 28-1(b) ("Parties must not . . . incorporate by reference briefs submitted to the district court . . . or refer this Court to such briefs for the arguments on the merits of the appeal.").

The prosecutor used his eleventh peremptory challenge to remove Clemons from the jury. The prosecutor justified the strike against Clemons, along with the strikes against Foster, Hill, and Simpson, by explaining that these jurors "indicated in one way or another at the very least an ambivalence and the lack of commitment, at least in my mind, of their willingness to impose the death penalty." According to the prosecutor, "there was a vacillation that they reflected and a situation that I felt I could not take the chance of them hanging this should we get to the point of a death penalty, a penalty phase."

Referring to Clemons in particular, the prosecutor stated that her responses were "indicating, 'I think I could do it,' but reflecting, again a lack of conviction in her ability to do it, which gave me a great deal of concern as to whether I could afford to take the chance." In response to defense counsel's arguments, the prosecutor continued to justify his strike against Clemons:

> Miss Clemons, in the question that we asked as to how they feel, a range of emotion about the death penalty in general, she reflects a neutral feeling and she's not sure whether she would vote for it if it were on the ballot. And again, it does come down to a lack of certainty and conviction that is promulgated from what she has to say or the prospective juror has to say as well as how they say it and relying upon my experience in judging and evaluating people.

As with Foster, the trial court denied the first *Wheeler* motion "[a]fter an analysis of the proffered reasons and the court's own observations."

The California Supreme Court reasonably determined that "the record supports the prosecutor's statement that Prospective Juror J.C. [Jean Clemons] was ambivalent." *See Stevens*, 41 Cal. 4th at 195–96. In concluding that the prosecutor's race-neutral rationale for striking Clemons was credible, the trial court stated it relied on its "own observations." The California Supreme Court deferred to the trial court's credibility determination, *Stevens*, 41 Cal. 4th at 198.

The record supports the California Supreme Court's determination that Clemons's responses were ambivalent. Clemons stated on her questionnaire that she was not sure how she would vote on the ballot for the death penalty and had "not made up [her] mind on the death penalty." She stated during voir dire, "I think I would vote for [the death penalty]," but then added that it "depends on the crime," and she "would have to wait until it actually happened before I make up my mind finally." She elsewhere expressed ambivalence about voting for the death of a "real person." When asked about her ability to vote to impose the death penalty, Clemons framed her answers by saying "I think I could" or "I really believe I could," but recognized that it would be "kind of hard" to be in the position to vote for death.

Stevens claims that the California Supreme Court's determination was unreasonable. According to Stevens, the prosecutor mischaracterized Clemons's responses when he said she was ambivalent, because her questionnaire responses

were more ambivalent than her voir dire responses. We disagree. As with many other jurors, the responses made publicly in voir dire were more nuanced than the responses made on the questionnaire, but both Clemons's questionnaire responses and her public voir dire responses reflected a lack of certainty and ambivalence. Based on Clemons's answers, the California Supreme Court could reasonably conclude that the "overall tenor" of Clemons's responses supported the prosecutor's stated justification of ambivalence. *Stevens*, 41 Cal. 4th at 197–98.

Stevens next argues that a comparative juror analysis establishes that the prosecutor's justifications for striking Clemons were pretextual. These arguments are similar to those Stevens made with respect to Foster, and fail for the same reason. *See* Part III.A *supra*. Although the seated jurors Mercie, Collondrez, Favareille, and Watkins expressed ambivalence toward imposing the death penalty, their views were not so similar to Clemons that the California Supreme Court was objectively unreasonable in upholding the trial court's factual finding that the prosecutor had a nondiscriminatory basis for striking Clemons. Indeed, the California Supreme Court described Clemons's responses as "[u]nlike" those offered by Collondrez. *Mayes*, 766 F.3d at 197–98.

Stevens asks us to compare Clemons to additional prospective jurors who were not part of his argument to the California Supreme Court. First, he claims that Clemons "was certainly less ambivalent than both Prodger and Jordan," and also adds in a comparison to Sydney Santos, who was accepted by the prosecutor before being struck by Stevens. As before, we reject the comparison of Clemons to Prodger and Jordan. Prodger and Jordan expressed pro death

penalty views, and Jordan, who was struck by Clark, had a family connection to law enforcement. *Supra* Part III.A. We also reject the comparison of Clemons to Santos, who stated she was "[s]trongly in favor" of the death penalty, had "came to favor it" as she grew older, and would have voted for the death penalty on the ballot because, "[i]f one of my family was murdered I would want the murder[er] to receive the death penalty." In light of this record evidence regarding the views of Prodger, Jordan and Santos regarding the death penalty, the California Supreme Court's determination that the prosecutor's strike of Clemons was not pretextual is not objectively unreasonable. Further, we reject Stevens's arguments that Domenichelli was more ambivalent than Clemons. While reasonable minds could disagree on that point, such disagreement is not itself sufficient for us to conclude that the California Supreme Court was objectively unreasonable in deferring to the trial court's factual determination that the prosecutor struck Clemons for her ambivalence. *See Sifuentes*, 825 F.3d at 516 (citing *Burks*, 27 F.3d at 1429).

Stevens makes the additional point that the prosecutor struck Clemons even though she said she was neutral as to the death penalty, while seven other prospective jurors (Collondrez, Favareille, Jordan, Riehl, Persons, Domenichelli, and Banks) who stated they were neutral were accepted by the prosecutor. He argues that this comparison supports the inference that the prosecutor's strike of Clemons was pretextual. We reject this argument. A reviewing court is not limited to comparing single statements by prospective jurors in isolation, but may consider all the evidence in the record shedding light on their views, including recognizing that the trial court and prosecutor were exposed to demeanor evidence for each juror. *Ayala*, 576 U.S. at 273. Although

Collondrez, Favareille, and Jordan stated they were neutral on the death penalty, as we have discussed, their testimony otherwise was less ambivalent than Clemons's testimony. *Supra* Part III.A.3. Catherine Riehl also stated she was neutral on the death penalty, but stated that she supported Chief Justice Bird's removal, would vote for the death penalty on the ballot, and offered little, if any, equivocation or ambivalence in any of her voir dire answers. As for Domenichelli, while reasonable minds could disagree on whether she was more or less ambivalent than Clemons, that is insufficient to find that the California Supreme Court's decision was objectively unreasonable. *See Sifuentes*, 825 F.3d at 516 (citing *Burks*, 27 F.3d at 1429). Finally, Stevens notes that black juror Almeta Person and black alternate juror Sheri Banks stated they were neutral on the death penalty, but the prosecutor's acceptance of these black prospective jurors does not tend to prove discrimination. *See Miller-El II*, 545 U.S. at 241.

Stevens again raises the additional evidence he identified in his argument regarding Foster, including statistical evidence, the district attorney's office's alleged pattern and practice of discrimination, and the prosecutor's alleged discrimination against Jewish prospective jurors. For the reasons explained above, this additional evidence fails to alter our conclusion that the California Supreme Court was not objectively unreasonable in declining to disturb the trial court's factual determination.

## C

Stevens's argument that the California Supreme Court made an unreasonable determination of the facts in rejecting

his claim that the prosecutor acted with discriminatory intent in striking Henry Hill also fails.

The prosecutor used his first peremptory strike to remove Hill from the jury. As with the other jurors, the prosecutor justified his strike against Hill on the ground that he had expressed "ambivalence and the lack of commitment" in his "willingness to impose the death penalty." According to the prosecutor, Hill "kept on bouncing around" and answering that he would "need all the information" before making a decision, and this repeated answer reflected "more of an ambivalence." Further, the prosecutor added, "As I was talking with him, I could smell a very strong odor of alcohol on him, and he admits in his questionnaire that he is an alcoholic and that alcohol has gotten him into trouble."

The California Supreme Court reasonably determined that "the record supports the prosecutor's stated reasons" for striking Hill. *Stevens*, 41 Cal. 4th at 195. On his questionnaire, Hill stated that the death penalty was "ineffective due to [the] fact th[at] it can be delayed any number of times by anyone convicted" and that the death penalty "has not shown to be a deter[r]en[t] for anyone com[m]itting crimes." While Hill stated that he would vote for the death penalty on the ballot because it "might cause criminals to think twice" if the penalty was "implemented and enforced to the maximum," when he was questioned during voir dire about his ability to be open-minded and consider all the evidence, Hill gave lengthy, sometimes rambling answers, insisting that he could not pass judgment until he had "all the facts" and that he was an "information junkie" who did not "like to leave gaps" in information. Hill ultimately said that he was "pretty sure I could live with" imposing the death penalty but only "[i]f all indications pointed to that particular

situation [of voting for death]," Given Hill's concerns, the California Supreme Court was not objectively unreasonable in concluding that the prosecutor's stated justification regarding Hill's ambivalence and his "falling back" on needing evidence was supported by the record and did not misrepresent Hill's answers. *See Stevens*, 41 Cal. 4th at 194.

The prosecutor also based his decision to strike Hill on the ground that he had "a very strong odor of alcohol on him," and "he admits in his questionnaire that he is an alcoholic and that alcohol has gotten him into trouble." The prosecutor explained that he was "always concerned about someone who's drinking in the middle of the day . . . and who admits that he's got an alcohol problem and he's still drinking." This rationale is also supported by the record. Asked on the questionnaire whether alcohol abuse had touched his life, Hill said "Yes" and explained, "I am an alcoholic." Hill also disclosed on his questionnaire that he had been convicted for driving while intoxicated and was punished with house arrest and a fine. During voir dire, Hill stated that this conviction occurred only "[a] year and a half ago."

Stevens does not contest the conviction or Hill's self-identification as an alcoholic, but argues that there is no evidence supporting the prosecutor's statement that Hill smelled of alcohol in the courtroom. Relying on *Snyder*, Stevens argues that the lack of evidence confirming that Hill smelled of alcohol raises the inference that this justification is pretextual. This argument is based on a misreading of *Snyder*. In *Snyder*, a prosecutor justified his strike of a black prospective juror based on two race-neutral reasons, first, that the prospective juror "looked very nervous," and second, that he was a student teacher who did not want to miss class, and

might be inclined to reach a quick decision on a lesser verdict. 552 U.S. at 478–79. The trial court allowed the strike. On direct review, the Supreme Court held that the second race-neutral reason was belied by the record, which gave rise to an inference of discriminatory intent. *Id.* at 485. Because the record did not show that the trial judge credited the prosecutor's claim that the prospective juror was nervous, while other evidence in the record supported an adverse inference, the Supreme Court concluded that the prosecutor could not justify his preemptory challenge based on the nervousness alone. *Id.* In this case, by contrast, the record supported the prosecutor's rationales for striking Hill, who showed ambivalence to the death penalty and was self-identified as alcoholic, and the trial court's failure to confirm that Hill smelled of alcohol was therefore irrelevant.

A comparative juror analysis and other circumstantial evidence for the strike against Hill does not support Stevens's arguments. We therefore conclude that Stevens has failed to show that the California Supreme Court made an objectively unreasonable determination of the facts in upholding the trial court's finding that the prosecutor did not purposefully discriminate in striking Hill.

## D

The California Supreme Court did not address the remaining four black prospective jurors (Simpson, King, McCall, and Gray) struck by the prosecutor. The district court concluded that Stevens had failed to exhaust his claims relating to the strikes of Simpson, King, McCall, and Gray because in his brief to the California Supreme Court, he mentioned these jurors only in the section titled "Factual Background" and did not advance specific legal arguments.

On appeal, Stevens argues that the district court erred in reaching this conclusion, or alternatively, in failing to stay the case and hold it in abeyance to permit exhaustion.

We need not reach this issue because, regardless of whether Stevens properly exhausted these claims, we can address the claims on the merits. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). In addressing the merits, we need not decide whether a claim "adjudicated on the merits" by a state trial court is subject to AEDPA deference under § 2254(d) if the habeas petitioner failed to exhaust the claim fully in the state courts. Rather, we may "engag[e] in de novo review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

However, even under a de novo review, "we still defer to a state court's factual findings under § 2254(e)." *Crittenden v. Chappell*, 804 F.3d 998, 1011 (9th Cir. 2015). Specifically, the state court's factual findings are presumed correct, and that presumption can be overcome only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). A state court's factual findings include the ultimate issue underlying a *Batson* claim: whether the prosecutor's strikes were driven by purposeful discrimination. *See Hernandez*, 500 U.S. at 364 (describing "*Batson*'s treatment of intent to discriminate" as "pure issue of fact"); *Miller-El I*, 537 U.S. at 348 (noting that where 28 U.S.C. § 2254(e)(1) applies, habeas petitioners "must demonstrate that a state court's finding of the absence of purposeful discrimination was

incorrect by clear and convincing evidence"); *Sifuentes*, 825 F.3d at 515 (explaining that a "trial court's determination whether the prosecutor has intentionally discriminated turn[s] on evaluation of credibility . . . [which] is a pure issue of fact") (cleaned up).

Accordingly, to prevail on his *Batson* claims relating to the strikes of Simpson, King, McCall, and Gray, Stevens must establish, with clear and convincing evidence, that the trial court's finding of the absence of purposeful discrimination was incorrect. *See Miller-El I*, 537 U.S. at 348. Stevens has not done so.

1

Simpson was one of the four prospective jurors identified in Stevens's first *Wheeler* motion. As with Foster, Clemons, and Hill, the prosecutor struck Simpson based on his ambivalence and "the lack of commitment" in the "willingness to impose the death penalty." More specifically, the prosecutor referred to Simpson as "one of the most evasive people that we saw on this jury" and stated that Simpson "had the verbal skills to be evasive." The prosecutor stated that Simpson's evasive responses gave him "some concerns whether he would be willing to subordinate his beliefs to the law." The trial court determined that the prosecutor was credible.

The record supports the prosecutor's justifications. In response to the questionnaire's inquiry whether his personal beliefs would interfere with his ability to convict someone of murder, Simpson marked "yes," and wrote: "Depends on the issue and its severity." Asked on the questionnaire his opinion about the criminal justice system and Chief Justice

Bird's removal, Simpson answered both questions by writing: "Ambiguous." In response to the question "What are your GENERAL FEELINGS regarding the death penalty?" Simpson answered with a question: "Does the penalty fit the crime, when decided in this way?"

During voir dire, Simpson's answers were equally ambiguous. Simpson did not respond directly to questions, and could not tell either the prosecutor or defense counsel that he would follow the law instead of his own personal beliefs if they conflicted with the law.[17] Simpson finally agreed that he "would follow the law as it exists" but only after the prosecutor challenged Simpson for cause and Simpson engaged in a lengthy colloquy on the issue with the court and counsel.

Stevens asks us to compare Simpson with other jurors who stated on their questionnaires that they were philosophically neutral on the death penalty, or were not sure whether they would vote for the death penalty if it was on the ballot, or who made, in Stevens's view, similarly evasive responses. Again, we do not compare discrete statements, but rather look at the totality of the record for each juror. *See Miller-El II*, 545 U.S. at 242; *Mayes*, 766 F.3d at 961 n.16; *see also supra* Part III.A. Based on our review of the record,

---

[17] The prosecutor asked, "[W]ill you follow the law, or would you rely upon your own beliefs if it conflicts with what the law is?" Simpson responded, "I can not give you those assurances." Defense counsel attempted to clarify by asking "Are you open to both penalties, that is to say, the death penalty or life without the possibility of parole, or have you, by that time, decided on what penalty or another for whatever, you know, your own inner reasons are?" Simpson answered, "That's an interesting and intimidating question. The response continues to be that I could not give you those assurances."

no other juror accepted by the prosecution made a similar overall expression of ambivalent and evasive answers.

In explaining the reasons for his strike, the prosecutor also described Simpson as "a very strong willed individual" who was "much like" Arthur Wilner, a prospective nonblack juror also struck by the prosecutor. Stevens argues that the prosecutor was motivated by discrimination against Jewish prospective jurors and struck Wilner for being Jewish, and therefore the court should discount the prosecutor's statement that Simpson was a "strong-willed individual" like Wilner. This argument fails for several reasons. First, nothing in the record establishes that the prosecutor perceived Wilner as being Jewish.[18] Second, the prosecutor's comparison of Simpson to Wilner does not raise an inference that the prosecutor struck Simpson on the basis of race. Finally, the prosecutor's statement that Simpson and Wilner were strong-willed is supported by the record. Simpson's inability to provide assurances that he would follow the law instead of his personal beliefs is reasonably similar to Wilner's skepticism of the death penalty as an appropriate punishment for crimes other than treason. In any event, the comparison does not raise an inference that the prosecutor's reason for striking Simpson was pretextual.

---

[18] Wilner did not state a religion in his questionnaire or in voir dire. Stevens argues that Wilner's surname is Jewish and he had at least one parent who was Jewish, pointing to a 1930 census document which he claims shows that Wilner's mother spoke Yiddish. Even assuming we can judicially notice the census document, there is no evidence indicating that the prosecutor knew about this information at the time of jury selection. Nor does Stevens support his claim that the majority of individuals named Wilner are Jewish.

Considering Stevens's argument that the prosecutor's race-neutral reason for striking Simpson was pretextual, as well as the additional cumulative evidence identified by Stevens, *see* Part III.A.3, we conclude that Stevens has not carried his burden of showing, by clear and convincing evidence, that the prosecutor engaged in purposeful discrimination when he struck Simpson. *See Miller-El I*, 537 U.S. at 348.

2

The prosecutor used his fourteenth peremptory challenge to remove Patricia King. The prosecutor relied on King's "ambivalence," her "extremely equivocal" responses, and her "tremendous amount of difficulty in exuding confidence in her ability" to impose the death penalty. The trial court denied the *Wheeler* motion after considering "the arguments of counsel" and the court's "own observations and recollection of this juror."

The record clearly supports the prosecutor's justification. King explained that the death penalty "it is not a penalty that is pleasing to me" and that it "is necessary if there is absolutely no doubt of the guilt of the defendant." King admitted that, "to be very honest, I don't know if I could or couldn't" vote to impose death. Asked if she could vote for death knowing the execution procedure, King said three times that it would be "very difficult." Asked more directly by the prosecutor whether this was "a case that perhaps you should pass on because of how you feel," King acknowledged as much: "I think it's something I should probably pass on . . . ." Pressed more by the court, King concluded, "All I can say is I would try. That's all I can say." This repeated hesitance

and lack of confidence strongly supports the prosecutor's stated justification for striking King.

### 3

The prosecutor used his seventeenth peremptory challenge to remove Sarah McCall from the jury. The prosecutor justified his strike by explaining that McCall "wouldn't tell me whether or not she was for or against the death penalty," because she declined to say during voir dire how she would vote for the death penalty on the ballot. The prosecutor claimed that McCall "danced around in her answers" and was "very vague on the issue as to whether or not she could actually impose the death penalty." The prosecutor stated that "[h]er responses were similar to a number of other jurors that I had excused and the same vein as far as whether or not they could do it." The trial court denied the *Wheeler* motion based on the record and "the court's own observations."

The record supports this justification. In her responses to the jury questionnaire, McCall stated that she was moderately in favor of the death penalty, but was not sure how she would vote if it were on the ballot. During voir dire, she reiterated that she was "not prepared to answer [the ballot question] at this time." Asked twice about whether she could vote to end Stevens's life, she gave an unresponsive answer: "I've thought about it" but declined to elaborate. The prosecutor's stated justification that McCall declined to give responsive answers is borne out by the record.

4

The prosecutor used his eighteenth peremptory challenge to remove Gray from the jury.  The prosecutor had originally challenged Gray for cause, having concluded "there was no way she was going to impose the death penalty."  The trial court denied the *Wheeler* motion, after noting that it had Gray's answers in mind because of the for cause challenge.

In her jury questionnaire, Gray stated that she was moderately against the death penalty.  Although she was "becoming a little closer to being in favor" after herself becoming the victim of a crime, she stated she had "not made up my mind yet."  During voir dire, Gray admitted that she had been "against the death penalty" for most of her life but only recently "questioned the strength of that belief."  Asked directly whether voting for the death penalty was a "real option" for Gray in Stevens's case, Gray said, "No."  Asked again whether Gray could vote for death knowing the execution procedure, Gray responded, "It would be extremely difficult for me to do.  It's a question that I just couldn't answer.  It would be very hard for me.  If I had to know the choice and had to give you an answer, one or the other, just this second, I would say no."  Gray also stated that she was perhaps not fit to serve on the jury.  Although Gray later said the death penalty could be appropriate and that she was "not saying that [she] couldn't" vote for death, the record supports the prosecutor's stated justification that Gray expressed an inability and strong reluctance to vote for death.

Based on our de novo review, we conclude that the prosecutor's race-neutral justifications for striking Simpson, King, McCall and Gray are supported by the record and not belied by any comparative juror analysis.  Stevens fails to

demonstrate, by clear and convincing evidence, that the trial court erred in finding the prosecutor had not purposefully discriminated on the basis of race. *See Miller-El*, 537 U.S. at 348. Thus, we affirm the district court's judgment denying Stevens's habeas claims for King, McCall, and Gray.

IV

We now turn to Stevens's arguments under 28 U.S.C. § 2254(d)(1) that the California Supreme Court's decision was an unreasonable application of *Batson*, *Snyder* and *Miller-El I* and *II*, and was contrary to *Miller-El I* and *II* and *Flowers.*

First, Stevens claims that the California Supreme Court unreasonably applied *Batson* by failing to consider sua sponte all of the struck prospective black jurors and compare them with all of the prospective nonblack jurors who were not struck, regardless whether Stevens had asked the court to consider them.[19]

---

[19] Stevens also claims that a concurring opinion in *People v. Harris*, 57 Cal. 4th 804, 865–66 (2013) (Liu, J., concurring), shows that the California Supreme Court unreasonably applied Supreme Court precedent. In the *Harris* concurrence, a state court justice expressed "serious doubts" that the California Supreme Court has "held true to *Batson*'s mandate," or "maintained the proper level of vigilance" over trial courts and prosecutors. 57 Cal. 4th 804, 865–66 (2013) (Liu, J., concurring). The concerns expressed by one justice about the jurisprudence of his colleagues does not show that the California Supreme Court was objectively unreasonable in its application of Supreme Court precedent. Rather, AEDPA "demands that state-court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

We disagree. Neither *Batson*, *Miller-El II*, nor *Snyder*
clearly establish such a rule. A basic principle of our
adversarial system is "the principle of party presentation."
*United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579
(2020). "[W]e rely on the parties to frame the issues for
decision and assign to courts the role of neutral arbiter of
matters the parties present." *Id.* (quoting *Greenlaw v. United
States*, 554 U.S. 237, 243 (2008)). *Batson* did not alter this
fundamental principle. To the contrary, "*Batson* did not
dictate the formal steps the trial court must take to evaluate
the prosecutor's credibility, it only established that the trial
court must do so." *Murray*, 745 F.3d at 1005. And "*Batson*
and the cases that follow it do not require trial courts to
conduct a comparative juror analysis" at all. *Id.* Although
*federal* courts must perform a comparative juror analysis
advanced by a state prisoner, even if the state reviewing court
has not done so, *see Sifuentes*, 825 F.3d at 518 n.4; *Jamerson*,
713 F.3d at 1224, the Supreme Court has not established that
state reviewing courts have such an obligation. Here, the
California Supreme Court's decision to evaluate only
Stevens's specific arguments was not contrary to Supreme
Court precedent.[20]

Second, Stevens argues that the California Supreme
Court's decision was contrary to *Miller-El I* and *Miller-El II*
because the facts here are materially indistinguishable from
the facts in those cases. This argument also fails, because the
California Supreme Court could have made a principled

---

[20] We do not address the question whether the California Supreme
Court unreasonably applied Supreme Court precedent in failing to address
the jurors that Stevens included in the section entitled "Factual
Background" because we evaluated Stevens's habeas claims related to
those jurors on the merits. *See* Part III, section D.

distinction between those cases and the case before it. In *Miller-El I* and *II*, the Supreme Court considered a disproportionate strike rate against black prospective jurors, *Miller-El I*, 537 U.S. at 331; *Miller-El II*, 545 U.S. at 240–41, together with a comparative juror analysis revealing clear pretext and material mischaracterizations of responses from prospective jurors, *see Miller-El II*, 545 U.S. at 242–46. Based on this evidence, the Supreme Court concluded the prosecutor's rationales were clearly pretextual. *See Miller-El II*, 545 U.S. at 242–46. Here, by contrast, the comparative juror analyses do not show clear evidence of pretext, the prosecutor did not materially mischaracterize prospective jurors' responses, and the strike rate was not as disproportionate. "[W]hen a state court may draw a principled distinction between the case before it and Supreme Court caselaw, the law is not clearly established for the state-court case." *Murdoch v. Castro*, 609 F.3d 983, 991 (9th Cir. 2010).

Stevens's comparison to *Flowers* also fails. Because *Flowers* was decided more than a decade after the California Supreme Court's decision here, it was not clearly established precedent "as of the time the state court renders its decision." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) (cleaned up). Even if we consider *Flowers*, however, there is a principled distinction between *Flowers* and this case. In *Flowers*, a defendant was "tried six separate times" by the same prosecutor and each trial was marked by a near 100 percent strike rate against black prospective jurors. *See Flowers*, 139 S. Ct. at 2234–35. Further, the prosecutor engaged in "dramatically disparate questioning" of prospective jurors, and made a "series of factually inaccurate explanations for striking black prospective jurors." *Id.* at 2235, 2250. Based on this evidence, the Supreme Court concluded that "all of

the relevant facts and circumstances taken together establish that the trial court" at the defendant's last trial "committed clear error in concluding that the State's peremptory strike of" one prospective black juror did not constitute purposeful discrimination. *Id.* at 2252. No such "extraordinary facts" exist here.

Finally, Stevens argues that the California Supreme Court applied an erroneous legal standard. In conducting its comparative juror analysis, the California Supreme Court stated that the seated jurors identified by Stevens (Collondrez, Favareille, and Watkins) did not show a "striking similarity" in ambivalence to struck prospective jurors. *Stevens*, 41 Cal. 4th at 196, 198. Stevens argues that the California Supreme Court erred in using this terminology, because it should have considered whether the seated nonblack jurors were "similarly situated" to the black prospective jurors the prosecutor struck. *Miller-El II*, 545 U.S. at 247.

We reject this argument. In context, the California Supreme Court used the phrase "striking similarity" to mean that the congruence between the ambivalence expressed by the seated jurors and that expressed by the struck prospective jurors was not *so significant* that it raised an inference— contrary to the trial court's observations—that the prosecutor was not credible. This is confirmed by the language used by the California Supreme Court, which stated that the seated jurors did not demonstrate "*such a* striking similarity" or "*such* striking similarity" to warrant a finding of pretext. *Stevens*, 41 Cal. 4th at 196, 198 (emphasis added). The California Supreme Court could reasonably conclude that, absent such significant congruence, the credibility findings of the trial court should remain undisturbed. The California Supreme Court's approach on this issue is not contrary to or

an unreasonable application of any Supreme Court case. *See Ayala*, 576 U.S. at 274 (explaining courts should defer to trial court's credibility finding absent "exceptional circumstances").

Therefore, we determine that the California Supreme Court did not reach a decision "that was contrary to, or involved an unreasonable application of, clearly established federal law." 28 U.S.C. § 2254(d)(1).

V

As a federal court reviewing a state court's decision and the trial court's findings of fact, our role is limited to guarding against "extreme malfunctions in the state criminal justice systems." *Ayala*, 576 U.S. at 276 (cleaned up). With no such malfunction here, we decline to substitute our own judgments for the factual credibility determinations made almost three decades ago by the state trial court. Therefore, we affirm the district court's judgment denying Stevens federal habeas relief.

**AFFIRMED.**